Ralph MORTIER and Wisconsin Forestry/Rights-Of-Way/Turf Coalition, Plaintiffs-Respondents,

v.

TOWN OF CASEY, Wisconsin, Imbert M. Eslinger, Louis N. Place, Roland K. Colby and State of Wisconsin Public Intervenor, Defendants-Appellants.

Supreme Court

*No. 88-1423. Argued September 7, 1989.—Decided March 12, 1990.*

(Also reported in 452 N.W.2d 555.)

For the defendants-appellants there were combined briefs (in court of appeals) by *Linda Monroe,* Madison, and *Thomas J. Dawson,* assistant attorney general and oral argument by *Linda Monroe* and *Thomas J. Dawson.*

For the plaintiff-respondent there was a brief (in court of appeals) by *Paul G. Kent, Richard J. Lewandowski,* and *DeWitt, Porter, Huggett, Schumacher and Morgan, S.C.,* Madison and oral argument by *Mr. Kent.*

Amicus curiae brief was filed by *Eugene O. Gehl* and *Barbara J. Swan,* Madison, for Wisconsin Power and Light Company, Northern States Power Company, Wisconsin Public Service Corporation and Wisconsin Electric Cooperative Association.

HEFFERNAN, CHIEF JUSTICE. The question presented in this appeal from an order for a declaratory judgment of the circuit court for Washburn county is

whether the ordinance of the Town of Casey purporting to regulate the use of pesticides in the Town is preempted by the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA).[1] We conclude that the ordinance is preempted by the federal law, because the legislative history of the enactment in 1972 reveals a clear intent of the congress to preempt all local regulation of the use of pesticides. We affirm the order of the circuit court declaring the Town of Casey ordinance "void, invalid and of no effect."[2]

The facts are undisputed. The plaintiffs are a coalition of persons who challenge the ordinance on grounds that it is preempted by both federal and state legislation. Mortier, one of the plaintiffs, sought to spray a portion of his own land located in the Town of Casey with a pesticide. He applied for a permit to do so. The permit was granted subject to restrictions mandated by the Town of Casey's ordinance, which precluded aerial spraying and limited the land area which could be sprayed. Mortier and his fellow plaintiffs brought a declaratory judgment action to declare the ordinance invalid on the grounds of preemption.

We start our analysis of preemption recognizing the constitutional basis of the separate sovereignty of the United States and of the state of Wisconsin. The Tenth Amendment to the United States Constitution recog-

---

[1] 7 U.S.C., sec. 136 et seq.

[2] This appeal from the order entered on June 16, 1988, was accepted on bypass of the court of appeals (sec. 809.60, Stats.) pursuant to the joint petition of all parties.

Because we decide the case on the controlling question of federal preemption, we do not address the question of whether the enactments of the Wisconsin legislature also preempt the Town ordinance. The circuit court held that the town ordinance was preempted by both federal and state legislation.

nizes that "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

There is, however, no intimation in the record that the enactment of FIFRA was not a proper and constitutional exercise of the legislative power of the United States. Nor is there any intimation that the state of Wisconsin or its political subdivisions lack the police power to enact pesticide regulations. The controlling question arises under art. VI, clause 2, of the United States Constitution, the supremacy clause, which provides that all laws of the United States made pursuant to the Constitution are "the supreme law of the land . . . any thing in the constitution or laws of any state to the contrary notwithstanding."

This latter portion of the Constitution, at least since 1824, has been held to invalidate any state laws that "interfere with, or are contrary to," federal law. See *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 211 (1824), Marshall, C.J.

The test for determining whether the state law must be invalidated or preempted in light of a congressional enactment has been variously stated. The essence of the inquiry is succinctly and simply summarized by Judge Kaufman in *New York State Pesticide Coalition, Inc. v. Jorliny*, 874 F.2d 115, 118 (2d Cir., 1989), "[O]ur task is to ascertain the intent of Congress." See also, *Allis Chalmers Corp. v. Lueck*, 471 U.S. 202, 208 (1985). For purposes of the supremacy clause, the constitutionality of local ordinances is analyzed in the same way as that of state laws. *Hillsborough County v. Automated Medical Labs,* 471 U.S. 707, 712 (1985); *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624 (1973).

In general, it can be said, however, that the general presumption that arises out of the federal system of dual sovereignty is that there shall be no preemption unless that intent of congress is rather clear. In *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947), the United States Supreme Court stated the rule that "[T]he historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."

Thus, preemption, the superseding of the sovereign prerogatives of a state, should not be lightly assumed, but should be found only when it is the intention of the congress to assert federal primacy in a particular field.

The clearest declaration of intent is simply a congressional statement appearing in the legislation which asserts federal primacy. One example is referred to in *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 626-27 (1973): " 'The United States of America is declared to possess and exercise complete and exclusive national sovereignty in the airspace of the United States . . ..' "[3]

There may also be preemption of state laws or local ordinances where no express preemption appears in the congressional legislation, but the entire statutory context or regulatory terrain impels the conclusion that congress intended to exclude states and local governments from the area of concern. The *City of Burbank* case, *supra,* is illustrative of this type of determination of congressional intent to preempt from the pervasive

---

[3]*City of Burbank* turned on an analysis of the pervasive nature of the scheme of aircraft noise regulation and not on the quoted preemptive statement in respect to airspace. The statement does, however, illustrate an express statement of federal preemption. 411 U.S. at 633.

nature or completeness of the examined congressional scheme.

In the *Burbank* case, there was no express provision for preemption of noise control, but the court, relying upon *Rice v. Santa Fe Elevator Corp., supra* at 230, concluded that there could be a "clear and manifest purpose" of congressional preemption even though no statement of congressional preemption appeared in the legislation. It found that clear and manifest congressional purpose in the "pervasive nature of the scheme of federal regulation of aircraft noise . . .." 411 U.S. at 633.

Thus, although the congressional intent to preempt may, in some case, only be apparent by implication, the congressional purpose can nevertheless be clear.

It should be noted that the pervasive nature of the federal act in *Burbank* was derived not alone from the words of the act and concomitant federal regulations, but from the legislative history of the anti-noise bill, including statements appearing in committee reports, statements of the Secretary of Commerce, statements of the chairpersons of the affected congressional committees, and the statement of the President made contemporaneously with the signing of the bill.[4]

Under the express words of the supremacy clause, state law must give way to contradictory or incompatible provisions of a congressional enactment. The plaintiffs assert that, in practice, that must be the result here, for

---

[4]The dissent of Justice Rehnquist reaches the opposite conclusion, *i.e.*, that the congressional intent was to allow local regulation. Although they differ in their conclusion as to whether a "clear and manifest purpose" to preempt can be found, the significance of both the majority and the dissent in *Burbank* to the instant case is their reliance on legislative history. In his dissent, Justice Rehnquist acknowledges that implied preemption in a proper case may be based on legislative history.

on its face the Town of Casey ordinance could prohibit completely the use of FIFRA-approved pesticides by FIFRA-approved applicators according to FIFRA-approved label instructions. While, as a matter of law, we do not disagree with the plaintiffs' premise, the situation in light of the record is a hypothetical one, for no such complete prohibition is posed by the facts, and we need not address the plaintiffs' assertion in light of our reliance on the legislative history, which we conclude demonstrates a clear and manifest congressional intent to preempt all local regulation.

Thus, there are many paths to determine preemption. The easiest and most forthright, in the absence of an outright statement of federal preemption in the legislation, is simply to start out with the constitutionally directed assumption that, in view of the nature of the federal system, there can be no preemption unless there is an express and unequivocal congressional statement that, in the particular area of legislation, the congressional actions are supreme and state laws are invalid. If the presumption is taken literally, anything less than a forthright preemption statement is ambiguous and traditional state powers must be allowed to stand. While this is an attractive and logical option, it is not the law, for almost all preemption opinions of the Supreme Court deal with ambiguities where there is no express preemptive statement in respect to congressional intent.

While FIFRA does not contain any express preemption language, it does, however, contain language which is indicative of congress' intent to deprive political subdivisions, like the Town of Casey, of authority to regulate pesticides. In sec. 136v, congress authorizes only "states" to regulate pesticides. Then, in sec. 136(aa), the act states that political subdivisions are excluded from

24

the definition of "states." See *infra.* Because it is not clear that the statutory language alone evinces congress' manifest intent to deprive political subdivisions of authority to regulate pesticides, it is ambiguous. Accordingly, we look to the legislative history to ascertain the primary congressional purpose in enacting these sections and using this particular language. *Philko Aviation, Inc. v. Shacket,* 462 U.S. 406, 410-11 (1983); *City of Burbank v. Lockheed Air Terminal,* 411 U.S. 624, 634-38 (1973).

The intent of congress—to preempt local, but not state, regulation—becomes abundantly clear when the end product of the congress is considered in light of the progress of the pesticide bill through the congress.[5]

The history of pesticide regulation in this country reflects a struggle between recognizing the important role pesticides play in making the United States a leader in world food production and recognizing the risks that pesticides pose to public health and the environment. With these competing public policies in mind, President Nixon proposed legislation in 1971 to develop a comprehensive regulatory scheme governing the use and sale of pesticides.[6] This proposal served as the basis for the pesticide regulation bill originally introduced as H.R. 4152.[7] The purpose of the proposed bill was "[to provide] for the more complete regulation of pesticides in order to provide for the protection of man and his environment and the enhancement of the beauty of the world around him."[8] FIFRA accomplished this goal by establishing a nationwide system for training and certifying pesticide

---

[5]An historical perspective of FIFRA from 1947 to 1983 is afforded by the opinion of *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 990-93 (1984).

[6]See *U.S. Code Cong. & Admin. News,* Vol. 3, p. 4001, 1972.

[7]See H.R. Rep. No. 92-5111, p. 12.

[8]See *U.S. Code Cong. & Admin. News, supra* at 3995.

applicators, requiring the registration of pesticides, limiting pesticide use to purposes permitted by law and by making it unlawful to use pesticides in a manner that is inconsistent with the label instructions on the container of the pesticide.

After 17 public hearings and 19 closed business meetings, the House Committee on Agriculture reported H.R. 10729 to the full House. H.R. Rep. No. 92–511, p. 13. This committee rejected a proposal which would have permitted political subdivisions other than states to further regulate pesticides:

> The Committee rejected a proposal which would have permitted political subdivisions to further regulate pesticides on the grounds that the 50 States and the Federal Government should provide an adequate number of regulatory jurisdictions.

H.R. Rep. No. 92–511, p. 16.

The bill was referred to the Senate Committee on Agriculture and Forestry. The Senate Committee on Agriculture and Forestry concurred with the House Committee on Agriculture's and the House of Representatives' decision to "deprive" political subdivisions of any authority over pesticide regulation. That committee's report states:

> The Senate Committee considered the decision of the House Committee to deprive political subdivisions of States and other local authorities of any authority or jurisdiction over pesticides and concurs with the decision of the House of Representatives. Clearly, the fifty States and the Federal Government provide sufficient jurisdictions to properly regulate pesticides. Moreover, few, if any, local authorities whether towns, counties, villages, or municipalities have the financial wherewithal to provide necessary

26

expert regulation comparable with that provided by the State and Federal Governments. On this basis and on the basis that permitting such regulation would be an extreme burden on interstate commerce, it is the intent that section 24, by not providing any authority to political subdivisions and other local authorities of or in the States, should be understood as *depriving* such local authorities and political subdivisions of any and all jurisdiction and authority over pesticides and the regulation of pesticides. [Emphasis supplied.]

S. Rep. No. 92-838, 92nd Cong. 2nd Sess. *reprinted* in *U.S. Code Cong. & Admin. News,* Vol. 3, pp. 3993, 4008, 1972.

The Senate Commerce Committee also had jurisdiction over the bill.[9] The Senate Commerce Committee introduced an amendment to the bill which would have given local governments the authority to regulate pesticides.[10] The Senate Committee on Agriculture and Forestry reasserted its intention to preempt local pesticide regulation.[11]

The two Senate Committees deliberated for almost two months and were able to arrive at a compromise in the form of a substitute bill.[12] The Senate Commerce Committee's amendment allowing local governments a role in pesticide regulation was excluded in the substitute bill.[13]

Eventually, H.R. 10729 came before the full Senate. The Senate rejected the amendment proposed by the Senate Commerce Committee which would have allowed

[9]118 Cong. Rec. 32251 (1972).
[10]*U.S. Code Cong. & Admin. News, id.* at 4066.
[11]*Id.* at 4066.
[12]*Id.* at 4091.
[13]*Id.* at 4091.

local governments to regulate pesticides.[14] The Senate passed the compromise version of H.R. 10729 by a vote of 71–0.[15] Concurring basically with the House version of the bill, in addition, Senator Allen, the Chair of the Subcommittee on Agricultural Research and General Legislation, inserted into the Congressional Record, the following:

> [FIFRA] should be understood as *depriving* such local authorities and political subdivisions of any and all jurisdiction and authority over pesticides and the regulation of pesticides. [Emphasis supplied.]

*Id.* at 32256.

Finally, members of the Senate and House met in conference to resolve differences between their respective versions of the pesticide legislation. The Conference Committee's explanatory statement reflects that the Committee did not consider the issue of local regulation of pesticides[16] as that had previously been resolved.

The completed act included the language which, coupled with the legislative peregrinations of the pesticide bill, unmistakably demonstrates the intent of congress to preempt local ordinances such as that adopted by the Town of Casey. 7 U.S.C., sec. 136v (1982 ed.) provides in part:

### § 136v. Authority of States
(a) A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

(b) Such State shall not impose or continue in effect any requirements for labeling or packaging in

---

[14]See 118 Cong. Rec. 32258 (1972).
[15]*Id.* at 32263.
[16]See *U.S. Code Cong. & Admin. News, id.,* at 4130–4135.

addition to or different from those required under this subchapter.

(c)(1) A State may provide registration for additional uses of federally registered pesticides formulated for distribution and use within that State to meet special local needs in accord with the purposes of this subchapter and if registration for such use has not previously been denied, disapproved, or canceled by the Administrator. Such registration shall be deemed registration under section 136a of this title for all purposes of this subchapter, but shall authorize distribution and use only within such State.

Thus, there has been a specific authorization for "states" to regulate the sale or use of pesticides. In effect, this is a declaration of negative preemption, *i.e.,* it is reasonable to conclude that this provision was inserted for the express purpose of negating any possible implied intent to preempt state regulations. From this alone, it is possible to infer that regulation by other governmental entities not protected from preemption by 7 U.S.C., sec. 136v, is preempted.

Congress left no doubt about what it meant when it referred to a "State." Section 136(aa) provides:

**(aa) State**
The term "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Trust Territory of the Pacific Islands, and American Samoa.

This provision in itself is persuasive under the *exclusion* rule that omitted governmental entities such as the Town of Casey are excluded or deprived of the right to regulate the use of pesticides. It is significant that congress was careful to distinguish between provisions which apply to "states" and provisions which apply to "states or political subdivisions." For example,

FIFRA provides in sec. 136t(b) that the EPA shall cooperate with any appropriate agency of any "State or any political subdivision." Moreover, this provision, when coupled with repeated references in the course of the legislative committee reports that the decision of both the House and Senate was to "deprive" political subdivisions of states and other local authorities of any authority or jurisdiction over pesticides, leads to the unmistakable conclusion that it was the clearly manifested intent of the congress to preempt any regulation of pesticides by local units of government. While the regulation of pesticides traditionally lies within the police powers of local communities, the federal legislation "deprives" them of that authority.

Moreover, the commentary to federal regulations promulgated pursuant to FIFRA, although after the fact of congressional action, expresses the administrative determination of the EPA that "It is not the intention of the Act or of these regulations to authorize political subdivisions below the State level to further regulate pesticides." 40 Fed. Reg. 11700.[17]

We agree with the basic conclusion of the United States District Court in *Maryland Pest Control Assoc. v. Montgomery County,* 646 F. Supp. 109 (D. Md., 1986), aff'd 822 F.2d 55 (4th cir., 1987), when it determined that the posting and notice provisions of a local unit of

---

[17]*Hillsborough County v. Automated Medical Labs,* 471 U.S. 707 (1985), is a case frequently cited for the proposition that mere pervasiveness of regulation and nothing more may not compel a conclusion of preemption. We refer to the opinion only because it points out that "state laws can be pre-empted by federal regulations as well as by federal statutes." P. 713. As stated above, the commentary is indicative of the EPA's authoritative construction of the congressional intent of FIFRA to exclude pesticide regulation below the state level.

government in respect to application of pesticides were preempted by FIFRA. In concluding that the local provisions were invalid, the United States District Court, after examining the same legislative history which we recounted above, stated:

> [T]his legislative history could not be more clear. Both the House and the Senate expressly considered the question of whether local governments should be authorized to regulate pesticides and, although there was an interim disagreement between two Senate committees on the issue, the legislation as finally enacted by the Senate and the House did not include the proposed language, clearly focused upon in both chambers, which would have authorized[18] local pesticide regulation. Principled decision-making and respect for the integrity of the legislative process compel the conclusion that Congress knew and meant what it was doing.

---

[18] While the parties seem to think that the term, "authorize," is indicative of sloppy thinking on the part of the District Court (because it is contended that local governments inherently possess that police power authority), that view of the court's language overlooks the fact that, without the language excepting "states" from the effect of the law, states, as well as local government powers, might well be construed to be preempted. Hence, it was appropriate to speak of local government authority. Moreover, the language used in the committee report makes pellucid that it was the will of the committee, eventually ratified by the congress, that local subdivisions of states be "deprived of authority." It was appropriate and perceptive for the United States District Court to refer to the question of whether, despite the nature of federal regulation imposed by FIFRA, localities in addition to states should nevertheless have the authority to impose additional regulations. Clearly, the unambiguous intent of the congress was to deprive the local units of government of their usual police power authority.

646 F. Supp. at 113.

Both the plaintiffs and defendants have posited policy reasons why their respective positions should prevail. The plaintiffs assert that the whole question of pesticide regulation is so complex and technical that local governments cannot possibly cope with the ever-changing advances in science and medicine—that only national and state regulation is feasible. The defendant Town, on the other hand, argues that only the localities where the pesticide will be used can be aware of the local conditions and the hazards that pesticide use can cause in a particular locality. Additionally, it is argued that to find preemption affronts the constitutional prerogatives of states' rights and home rule. All of these positions in the abstract and in reality have merit, but the question posed for this court's resolution is one of law and statutory interpretation: Was there a manifested intent by the congress that there be preemption? Because we conclude there was preemption of local regulation, it is clear that the policymaker—in this case the congress—must be given ultimate deference in its determination of policy, *i.e.,* that it is the policy of the United States Congress to allocate the power to regulate pesticides at a level that stops at the state level. If that policy is less than the optimum, the resolution must be left to the political arena and not to the judiciary. Moreover, if, as we find, that preemption was the intent of the Congress, fidelity to our constitutional structure requires that federal supremacy be recognized. We conclude that the circuit court correctly concluded that the preemptive action of the congress deprived the Town of Casey of its police power to regulate pesticides. We affirm the declaration of the circuit court that the Town of Casey's pesticide ordinance is invalid.

*By the Court.*—Order affirmed.

SHIRLEY S. ABRAHAMSON, J. (dissenting). The majority opinion concludes that in enacting the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) Congress divested local government of the power to regulate the use of pesticides for the health and safety of its citizens. Because I conclude that Congress has not demonstrated a clear and manifest purpose to deprive local government of its powers under the Federal Constitution, I dissent.[1]

## I.

The fundamental premise of preemption analysis is that absent any showing of "a clear and manifest purpose of Congress" to preempt state and local governmental regulation, the courts will not infer preemption. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). The United States Supreme Court has repeatedly expressed its reluctance to infer preemption, characterizing its reluctance as a presumption that "Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). This presumption is even stronger when the state or local governmental regulation relates to health and safety, which the Court has characterized "primarily, and historically, a matter of local concern." *Hillsborough County v. Automated Medical Labs, Inc.*, 471 U.S. 707, 718 (1985). See also *Rice v. Santa Fe Elevator Corp., supra* 331 U.S. at 230; *Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483, 487–88 (9th Cir. 1984), cert. denied 471 U.S. 1140 (1985).

---

[1] I limit my discussion to the federal preemption issue. I conclude, however, that the Town of Casey's Ordinance is not preempted by state law.

33

The Court's reluctance to infer preemption is grounded in its deference to the role of states in our federal system. If congressional intent or purpose is ambiguous, courts should be slow to find preemption, "[f]or the state is powerless to remove the ill effects of our decision, while the national government, which has the power, remains free to remove the burden." *Penn Dairies v. Milk Control Comm'n,* 318 U.S. 261, 275 (1943).

The United States Supreme Court has recognized that Congress may preempt state and local governmental power by express statutory language (sometimes referred to as *express exemption). Jones v. Rath Packing Company,* 430 U.S. 519, 525 (1977).

By requiring that the congressional decision to restrict state and local governments be made in a deliberate manner through the exercise of law-making power, the Supreme Court attempts to ensure a sound balance between state sovereignty and national interests. Tribe, *Constitutional Law* 480 (1988).

Absent express statutory language, courts must interpret the federal statute to determine whether the challenged state or local action "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941). State or local action will be an obstacle (1) if Congress dominates the regulatory field by structure or objective and "leaves no room" for supplementary state or local regulation (sometimes referred to as *implied preemption),* or (2) if state or local regulation conflicts with federal law (sometimes referred to as *conflict preemption). Florida Lime & Avocado Growers v. Paul,* 373 U.S. 132, 142 (1963); *Ray v. Atlantic Richfield,* 435 U.S. 151, 158 (1978); *Malone v. White Motors,* 435

U.S. 497, 504 (1977).[2]

## II.

I conclude that under each of these tests FIFRA does not preempt the Town of Casey's ordinance.

FIFRA contains no express language preempting local regulation, nor does it exclude political subdivisions from the definition of states, as the majority claims. Nor is the statute "ambiguous" regarding preemption—it is simply silent. See majority op. pp. 25–26.

Furthermore, there is no indication in FIFRA that Congress considered pesticide regulation to be an exclusive federal interest or that Congress occupied the field. Labeling of pesticides is under the exclusive control of the Environmental Protection Agency, but FIFRA explicitly authorizes states to regulate pesticides under federal guidelines. The 1972 Amendments provide that "a state may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter." 7 U.S.C. sec. 136v(a). Congress thus expressly provided that the states and the

---

[2]"The Supremacy Clause of Art. VI of the Constitution provides Congress with the power to pre-empt state law. Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress." *Louisiana Public Service Comm'n v. FCC*, 476 U.S. 355, 368–69 (1986) (citations omitted).

federal government share control over the use of pesticides for the safety of citizens and their environment.

Nothing in FIFRA expressly prohibits a state from delegating its power under FIFRA to municipalities. Congress apparently viewed the local governments as having some role. Under sec. 136t, the Environmental Protection Agency must cooperate with any state or "any political subdivision thereof, in carrying out the provisions of this Act, and in securing uniformity of regulations."

I cannot find in the structure or objective of the Act that Congress has dominated the regulatory field and left no room for supplementary local regulation.

Finally, the Town of Casey ordinance does not conflict with FIFRA. I therefore conclude that there is no conflict preemption.

### III.

As the foregoing discussion indicates, Congress was silent regarding local governments' authority to regulate pesticides and Congressional intent to preempt local governmental regulation. Congress did not occupy the regulatory field, and no conflict exists between FIFRA and the Town of Casey ordinance. Nevertheless, the majority opinion concludes that Congress expressly preempts local governmental regulation of pesticides. The majority opinion reaches its conclusion that Congress's silence amounts to an express Congressional intent to preempt local action by examining the legislative history surrounding the passage of FIFRA in conjunction with sec. 136v. Majority op. pp. 25–29.

While I have doubts about the methodological approach the majority employs,[3] I need not reach that

---

[3]The majority opinion does not fit into the traditional pre-

issue because the legislative history upon which the majority relies does not demonstrate with the requisite

emption analysis of express preemption, implied preemption, or conflict preemption even when you accept that the three categories are not analytically airtight. Tribe, *Constitutional Law,* 481, n.14 (1988).

The majority opinion apparently attempts to find express preemptive intent not in the text of the statute but in legislative history. It defends its reliance on legislative history to determine express Congressional intent about preemption (majority op. at pp. 22-24) by concluding that secs. 136v authorizing states to regulate the sale or use of any federally registered pesticide raises a negative implication that Congress intended to preempt local governmental regulation of pesticides. The majority opinion is saying that Congress's express authorization to the states raises a question about Congress's intent to proscribe local action. Building on this perceived "ambiguity," the majority opinion examines legislative history to determine Congress's express intent to preempt local action.

Neither case the majority opinion cites supports its approach that legislative history may serve as the sole basis for finding express intent about preemption or the clear and manifest purpose of Congress required for preemption of state or local regulations.

The majority opinion first relies on *City of Burbank v. Lockheed Air Terminal,* 411 U.S. 624 (1972). In that case the Supreme Court determined that the pervasive nature of federal regulation of airspace precluded imposing local noise controls on airports. After reaching this conclusion, Justice Douglas, writing for the majority, referred to legislative history during passage of the bill, stating that the bill would not change the preemption rule existing under previous statutes and to statements of Senators and the President asserting that federal regulation preempted state regulation. These references were apparently placed in the opinion to bolster a conclusion of the pervasiveness of the federal act that the Court had already reached (implied preemption).

In dissent Justice Rehnquist looked at earlier congressional

37

**degree of clarity that Congress expressly or impliedly intended to preempt local regulation.**

enactments, not legislative history during passage of the bill, to determine whether Congress had previously preempted the field from state or local regulation of the type that the City of Burbank had enacted. The majority and dissent apparently did not disagree about the legislative history during passage. They disagreed about the pervasiveness of the new federal act, about whether prior acts were pervasive also and whether Congress impliedly preempted local action.

I do not read *Burbank* as endorsing the majority opinion's claim that a court can examine conflicting legislative history to determine Congress's express intent to preempt local action. The majority opinion does not rest on the premise that FIFRA is pervasive and thus occupies the field (implied preemption).

In *Philko Aviation, Inc. v. Shacket,* 462 U.S. 406 (1983), the question was whether the federal statute required transfers of title to aircraft to be in writing and recorded with the FAA to be valid against innocent third parties. Philko was entitled to the plane if the federal statute governed all title transactions and supplanted local transfer law. Shacket would win if state law could govern transactions where no written transfer of title existed. The Court examined the legislative history not to determine congressional intent about preemption but to help define the statutory language relating to conveyances, thereby determining the scope of the federal legislation and whether the state law conflicted with the federal law. Once the Court clarified the federal statute's use of the term *conveyance,* the Court concluded that the state law conflicted with federal law and was preempted (conflict preemption).

Using the *Philko* approach, the majority opinion should look for legislative history illuminating the meaning of the word *State.* It does not. It cannot because the definition of state is clear. Instead, the majority looks to legislative history to determine Congressional express intent about preemption.

The *Philko* case does not stand for the rule that the Court will examine legislative history to determine Congress's express

38

Four other courts have examined the legislative history of FIFRA that the majority contends is "abundantly clear," majority op. pp. 25-26, and reached conflicting interpretations of Congressional intent. One court concluded that the legislative history of FIFRA demonstrates that Congress intended to preempt local regulation. *Maryland Pest Control Assoc. v. Montgomery County,* 646 F. Supp. 109 (D. Md. 1986), *aff'd* without opinion 822 F.2d 55 (4th Cir. 1987). Three courts concluded that the legislative history demonstrates that Congress did not intend to preempt local regulation of pesticides. *People ex rel. Deukmejian v. County of Mendocino,* 683 P. 2d 1150 (Cal. 1980); *Central Main Power Co. v. Lebanon* (Maine Supreme Judicial Court, March 6, 1990); and *Coparr, Ltd. and Caranci v. Boulder,* No. 87-M-1865 (Dist. Ct. Denver, Colo. October 3, 1989). Put in their best light, these cases suggest that the legislative history surrounding the enactment of FIFRA is ambiguous: courts reading the same documents have reached different conclusions. Viewed in their worst light, the results reached in the cases confirms Harold Leventhal's observation that statutory interpretation is akin to "looking over a crowd and picking out your friends."[4] As Judge Kozinski has noted, "[t]he fact of the

intent about preemption. The *Philko* case is a typical case in which the Court examines legislative history to determine the meaning of ambiguous language in the statute. The *Philko* court then determined there was preemption because of conflict.

[4]Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term,* 68 Iowa L. Rev. 195, 214 (1983). Judge Abner Mikva, a former member of Congress, has also warned against wholesale acceptance of legislative history. Committee reports are central pieces of evidence when attempting to determine legislative intent behind a particular legislative act. But "[c]ommittee reports are too frequently used for political

matter is that legislative history can be cited to support almost any proposition, and frequently is." *Wallace v. Christensen,* 802 F.2d 1539, 1559 (9th Cir. 1986).

Courts must use federal legislative history with healthy skepticism, recognizing that the history may not always be a trustworthy indication of congressional intent. As Justice Scalia has written, "[C]ommittee reports, floor speeches, and even colloquies between congressmen are frail substitutes for bicameral vote upon the text of a law and its presentment to the President." *Thompson v. Thompson,* 484 U.S. 174, 191–192, 108 S. Ct. 513, 523, 98 L. Ed.2d 512 (1988) (Scalia, J., concurring). See also *Hirschey v. FERC,* 777 F.2d 1, 7–8 (D.C. Cir. 1985) (Scalia, J., concurring).

---

horse-trading and individual ego trips . . .." *Reading and Writing Statutes,* 48 U. Pitt. L. Rev. 627, 631 (1987). Judge Mikva directs our attention to the minutiae which cloud any attempt to divine the intent of "535 prima donnas":

> Even the nuts and bolts of the legislative process can be valuable in divining the intent of Congress. The use of committee reports and floor debate (and lack of it), the difference between floor amendments and committee amendments, the trade-offs between statutory language and committee report language, the impact of conference committee changes in a bill, the effect of conflicting interpretations given by members during floor debate—all of these elements are weighed differently by judges who have been exposed to the tortuous way in which a bill becomes law.

Others have also counseled the use of caution when relying on federal legislative history. Eskridge and Frickey, *Legislation: Statutes and the Creation of Public Policy,* 695–776 (1988), Eskridge and Frickey, *Statutory Interpretation as Practical Reasoning,* 42 Stan. L. Rev. 321, 324–340 (1990); Hertzel, *Instilling Legislative Interpretation Skills in the Classroom and the Courtroom,* 48 U. Pitt. L. Rev. 663, 678–87 (1987); Posner, *Statutory Interpretation in the Classroom and in the Courtroom,* 50 U. Chi. L. Rev. 800, 805–815 (1983).

In reaching the conclusion that FIFRA preempts local regulation, the majority opinion relies to a large extent on the interpretations of provisions of H.R. 10729 found in the Report of the House Committee on Agriculture and the Report of the Senate Committee on Agriculture and Forestry. The usefulness of those reports as evidence of Congressional intent is limited.

First, the House and Senate Committee Reports included in the legislative history of FIFRA and relied upon by the majority opinion, see majority op. pp. 27–28, do not evaluate the pesticide bill passed by Congress. The Committees considered a significantly different and earlier version of the legislation. The Senate Commerce Committee added numerous amendments after the Senate Agriculture and Forestry Committee had considered the legislation.[5] A joint Senate committee made up of members of the Agriculture and Forestry Committee and the Commerce Committee also further changed the bill reported to the Senate by the Commerce Committee and created a compromise bill.[6] The bill the Senate passed was further modified by the Committee of Conference composed of members of the House and Senate.[7] The relevance of the Committee reports to the final bill passed by Congress and signed by the President is speculative.

Second, contrary to the assertions of the majority opinion, the language of sec. 136v can be interpreted in several ways. When the Senate Commerce Committee proposed amendments to clarify the role of local governments within FIFRA's regulatory structure, it inter-

[5] 118 Cong. Rec. 32249–51 (1972).

[6] *Id.* at 32257–58.

[7] *U.S. Code Cong. & Admin. News,* vol. 3, pp. 4130–4134 (1972).

preted sec. 136v as silent with regard to preemption. The Commerce Committee stated:

> While *the Agriculture Committee bill does not specifically prohibit local governments from regulating pesticides,* the report of that committee states explicitly that local governments cannot regulate pesticides in any manner. Many local governments now regulate pesticides to meet their own specific needs which they are often better able to perceive than are State and Federal regulators.[8] (Emphasis added.)

The disagreement between the two committees over the meaning and effect of sec. 136v depreciates the value of the Agriculture and Forestry Committee's interpretation of sec. 136v in determining the "clear and manifest purpose of Congress." Despite this disagreement about the meaning of sec. 136v, the statute was never changed to clarify whether FIFRA preempted local regulation.

Third, the majority opinion's reliance on the Agriculture and Forestry Committee's report does not take into account the subsequent compromise the two Senate Committees reached. In order to avoid a confrontation over differences between the differing versions of pesticide legislation reported to the Senate, members of the Senate Committee on Agriculture and Forestry and the Committee on Commerce met for nearly two months of heated discussion. According to a report ultimately filed by the group and included in the legislative history, "Commerce Committee amendment[ ] . . . 10 (which authorized local governments to regulate the use of pesticides) . . . [is] not included in the substitute."[9] Rather than indicating that the group intended FIFRA to preempt local action, the more plausible explanation is that

---

[8] *Id.* at 4111.
[9] 118 Cong. Rec., *supra* at 32252.

42

Congress never resolved the issue of preemption. In the interest of reporting a bill in the current session of Congress, members of both Senate committees agreed to disagree on the issue of preemption of local regulation.

Fourth, the majority opinion relies upon language added to the congressional record immediately prior to the final vote of the Senate to support its finding of preemption. See majority op. p. 28. Upon examination of the Congressional Record,[10] I find that the language relied upon by the majority opinion is simply a restatement of the report of the Senate Committee on Agriculture and Forestry already cited by the majority. See majority op. p. 26. For the reasons previously set forth, the Committee report is a questionable indication of congressional intent regarding the preemption of local regulation of pesticides.

Fifth, the majority opinion states that the Senate rejected the Commerce Committee's amendment that would have allowed local governments to regulate pesticides. See majority op. p. 28. The majority opinion overstates what occurred on the floor of the Senate. The amendments offered by the Senate Commerce Committee were withdrawn from the floor of the Senate in favor of the compromise struck by members of the Committee on Agriculture and Forestry and the Commerce Committee. As far as I can discern from the Congressional Record, the full Senate never considered the issue of local regulation of pesticides and therefore did not reject it by full vote.[11]

Finally, the majority opinion ignores the political atmosphere in which FIFRA was enacted and which probably accounts for Congress's failure to address the issue of local regulation. Both the Senate and the House

[10]*Id.* at 32252–56.
[11]*Id.* at 32252.

were under intense pressure from agricultural, environmental and industrial groups regarding pesticide legislation. Congress worked for nearly two years attempting to forge the delicate compromise necessary to pass a pesticide bill. The bill was considered highly controversial and was at risk of being defeated at nearly every turn. A number of speakers, including then Senator Gaylord Nelson of Wisconsin, rose to speak on the highly partisan nature of the debate and the fragility of the compromise reached on all sides.[12] In this turbulent political environment, the Senate never specifically considered the issue of preempting local governmental power, suggesting that the issue was not reached in the interest of passage of a pesticide bill.

The legislative history and the highly partisan nature of the debate suggest that Congress was unable to agree about preemption of local regulation. While the compromise struck in FIFRA may have been necessary to ensure passage of the bill, I do not think that it demonstrates Congressional intent with sufficient certainty to deprive the citizens of the Town of Casey of the power to protect themselves and their environment.

## IV.

I do not doubt that if Congress so chose, it could prevent localities from regulating pesticide use. See, *e.g.*, *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985). But absent "the clear and manifest purpose of congress" to accomplish such an end, the

---

[12]*Id.* at 32259. See also remarks of Senator Talmadge, *id.* at 32251 ("many of the issues were highly controversial"); remarks of Senator Packwood, *id.* at 32263 ("This package has evolved through much agony, deliberation, argument, reflection and compromise. Each has had to give some.").

presumption against preemption and the right of citizens of the Town of Casey to regulate pesticides must prevail. In contrast to the majority opinion, I prefer construing FIFRA with "due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy." *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 243 (1959).

For the reasons set forth, I dissent.

I am authorized to state that Justices Steinmetz and Bablitch join in this dissent.

STEINMETZ, J. (dissenting). No affirmative license or general permit has been issued for pesticides by the state or federal government. The federal and state laws which were grants of affirmative authorization were discussed as preemptions as analyzed in *Wis. Environmental Decade, Inc. v. DNR,* 85 Wis. 2d 518, 271 N.W.2d 69 (1978). If the federal government preempts, this will override the state's ability to act, but FIFRA, The Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. sec. 136, *et. seq.,* contemplates local regulations.

The Congressional Record contains a unanimously adopted committee report favoring preemption of local government regulation, but this recommendation came from only one house, the Senate, and not the entire Congress. *See* sec. 118 Cong. Rec. 32263 (1972). Indeed, the text of the transcript taken from the Congressional Record and relied upon by the respondents states only that committees from the Senate and House seemingly concurred on the local preemption issue. However, none of the specific Senate Agricultural Committee amendments read into the record clearly document this agreement and FIFRA's language does not document this.

The federal preemption test is whether legislation contains a clear, manifest intent. The United States Supreme Court expressed this test in the form of a starting-point assumption stating "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."[1] *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947).[2]

Implied preemption must also be clear. This is especially true in light of the United States Supreme Court's rule that a finding of implied preemption will be negated when there is no compelling congressional direction which justifies preemption of "interests so deeply rooted in local feeling and responsibility." *Farmer v. Carpenters,* 430 U.S. 290, 296–97 (1977); *see also Brown v. Hotel Employees,* 468 U.S. 491, 502–03 (1983). Here, any doubt must be decided in favor of local authority to act; the preemption works for, not against, local governments.[3]

---

[1]Congressional purpose to preempt may be manifested in a number of ways. First, Congress may expressly mandate preemption. Second, congressional language may impliedly preempt by adequately indicating an intent to fully occupy the field. Where both federal and state law occupy the same field, preemption may be found only when state and federal law so conflict that concurrent compliance is physically impossible or when state law frustrates accomplishment of the full purpose of the federal act. *See generally Brown v. Hotel Employees,* 468 U.S. at 501.

[2]*See also Hillsborough County v. Automated Medical Labs.,* 471 U.S. 707, 715 (1985); *Florida Avacado Growers v. Paul,* 373 U.S. 132, 147 (1963); *Chevron U.S.A., Inc. v. Hammond,* 726 F.2d 483, 488 (9th Cir. 1984).

[3]When analyzing a case for possible implied preemption, it is acknowledged that courts generally confine their studies to the language and legislative history of the statute in question. *See Chevron,* 726 F.2d at 491 n.10. As stated within the text of this

When attempting to determine whether an act is or is not preempted, the bottom line is that "Congress can act so unequivocally as to make clear that it intends no regulation except its own." *Rice,* 331 U.S. at 236 (citing *Bethlehem Steel Co. v. New York State Labor Relations Bd.,* 330 U.S. 767 (1947)).

FIFRA does not meet the clear manifestation of intent test above to prove, as respondents claim, that Congress unequivocally intended local governments to be preempted from acting on their local concerns as to pesticide use. To the contrary, in applying the test, I find that the end product of the congressional committee and the vote of the entire Congress appears to have been in favor of no preemption.

Specifically, a comparison of the end product language found in FIFRA at 7 U.S.C. sec. 136v(a) and (b), provides strong and persuasive proof that the federal government did not intend to preempt local governments from enacting ordinances affecting pesticide use.

Section 24(a), as amended, 7 U.S.C. sec. 136v(a)[4] authorizes states to regulate and impliedly authorizes states to delegate authority to local governments.[5] How-

---

dissent, however, I find neither language nor history in FIFRA to meet the test of clarity necessary to find implied preemption. This is especially true in light of what I find to be a local government's justifiably deep interest in protecting the health and safety of its citizens through local control over pesticide use.

[4]7 U.S.C. sec. 136v(a), provides:

> (a) A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

[5]I am unpersuaded by arguments that the narrow definition of the term "state" at 7 U.S.C. sec. 136(a) constitutes clear Congressional intent by elimination to preempt local government

ever, 7 U.S.C. sec. 136v(b)[6] contains an express preemption provision which prohibits states from enacting labeling laws. It is obvious from this subsection that where the full Congress desired preemption, the law expressly provided for it. Although sub. (b) only expressly prohibits states from dealing with labeling, it impliedly includes preemption of local governmental units in this area also. Any other interpretation would create an absurd result.

Congressional intent to allow local governments to take action in this area is also fairly implied from the express language of FIFRA sec. 22(b).[7] This section instructs the EPA administrator to cooperate with any agency of any political subdivision, *i.e.,* city, village, town, of a state to secure uniformity of regulations. These instructions would be meaningless if local governments were not perceived as having the authority to adopt regulations in the fist instance. Obviously, the full Congress contemplated there would be the authority in

---

action in this area. At no point in the language of the act are states prohibited from exercising their powers to delegate authority to local entities. Likewise, I am unconvinced that the clearly divisive disagreement that plagued the legislative history of this act was so easily and decisively resolved to the conclusion the proponents of a narrow reading of "states" might suggest.

[6]7 U.S.C. 136v(b) provides:

(b) Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

[7]7 U.S.C. sec. 136t(b), reads:

(b) Cooperation
The Administrator shall cooperate with Department of Agriculture, any other Federal agency, and any appropriate agency of any State or any political subdivision thereof, in carrying out the provisions of this subchapter, and in securing uniformity of regulations.

local governments to adopt pesticide laws for which the goal of cooperative uniformity would be sought.

Although individual committee recommendations may be persuasive, they do not dictate what the intent of the law is when it is adopted by the full Congress. That Congress debated the issue at great length without providing clear indications of preemption leads to the conclusion that no federal preemption was intended. *See Central Maine Power Company v. Town of Lebanon,* No. 5365 (Me. March 6, 1990); *People ex rel. Deukmejian v. Cty. of Mendocino,* 36 Cal. 3d 476, 683 P.2d 1150, 204 Cal. Rptr. 897 (1984) (neither the language of FIFRA nor the legislative history of FIFRA evidence a clear, manifest intent of Congress to preempt local government control of pesticide use).

The test of state preemption, as well as the analysis to be followed, coincides closely with the federal rules stated *infra.*[8] *See Wis. Environmental Decade v. DNR,* 85 Wis. 2d at 536 (analyzing sec. 144.025(2)(i), Stats., for clear legislative purpose). It is important to note that, in

---

[8]*See Anchor Savings & Loan Ass'n v. Madison EOC,* 120 Wis. 2d 391, 397, 355 N.W.2d 234 (1984) which states the Wisconsin rule on preemption:

> Where a municipality acts within the legislative grant of power but not within the constitutional initiative, the state has the authority to withdraw the power of the municipality to act. The tests for determining whether such a legislatively intended withdrawal of power which would necessarily nullify the local ordinance has occurred are:
>
> (1) whether the legislature has expressly withdrawn the power of municipalities to act;
>
> (2) whether the ordinance logically conflicts with the state legislation;
>
> (3) whether the ordinance defeats the purpose of the state legislation; or
>
> (4) whether the ordinance goes against the spirit of the state legislation.

this case, the town of Casey ordinance expressly states that the town is exercising its powers via secs. 60.10(2)(c)[9] and 60.22(3),[10] Stats., to adopt powers otherwise granted to village boards under sec. 61.34(1), Stats.[11]

Having exercised this option, the town's enactment enjoys a presumption of validity which is lost only if it is found to be clearly illegal. *See generally, State ex rel. Grand Bazaar v. Milwaukee,* 105 Wis. 2d 203, 208-09, 313 N.W.2d 805 (1982); *Clark Oil & Refining Corp. v. Tomah,* 30 Wis. 2d 547, 554, 141 N.W.2d 299 (1966). In that the ordinance is expressly enacted to protect the

---

[9]Section 60.10(2)(c), Stats., provides:

**60.10 Powers of town meeting.**
**(2)** DIRECTIVES OR GRANTS OF AUTHORITY TO TOWN BOARD . . .. By resolution, the town meeting may:
(c) *Exercise of village powers.* Authorize the town board to exercise powers of a village board under s. 60.22(3). A resolution adopted under this paragraph is general and continuing.

[10]Section 60.22(3), Stats., provides:

**60.22 General powers and duties.** The town board:
**(3)** VILLAGE POWERS. If authorized under s. 60.10(2)(c), may exercise powers relating to villages and conferred on village boards under ch. 61, except those powers which conflict with statutes relating to towns and town boards.

[11]Section 61.34(1), Stats., provides:

**61.34 Powers of village board. (1)** GENERAL GRANT. Except as otherwise provided by law, the village board shall have the management and control of the village property, finances, highways, streets, navigable waters, and the public service, and shall have power to act for the government and good order of the village, for its commercial benefit and for the health, safety, welfare and convenience of the public, and may carry its powers into effect by license, regulation, suppression, borrowing, taxation, special assessment, appropriation, fine, imprisonment, and other necessary or convenient means. The powers hereby conferred shall be in addition to all other grants and shall be limited only by express language.

50

health, safety and general welfare of the town's citizens, it also enjoys the protection of being limited only by express language. *See* sec. 61.34(1), Stats.

As was the case with the federal act, I find no express or implied preemption or any conflict or logical inconsistency between the Casey ordinance and Wisconsin laws governing pesticides. Sections 94.67–94.71, Stats., specifically provide for the possibility of state regulation of pesticides. These sections of ch. 94 are not applicable to the town. They merely authorize the Department of Agriculture to promulgate rules declaring, for example, certain pesticides to be toxic to humans. *See generally,* sec. 94.69.[12]

Chapter 94 is neutral as to what local governments may do. Even absent clear neutrality, if state law discussed the issue of affirmative pesticide permits or general licenses absent clear preemptive language, a local ordinance could still stand. Such rules may run on parallel tracks.[13]

---

[12]The following language from sec. 94.69(9), Stats., authorizes the department to promulgate rules governing the use of pesticides:

**94.69 Pesticides; rules.** The department may promulgate rules:

(9) To govern the use of pesticides, including their formulations, and to determine the times and methods of application and other conditions of use.

The language of this authority is permissive, however, and the corresponding Wisconsin Administrative Code sections speak only to restrictive uses of pesticides in that the rules promulgated expressly prohibit the use of certain pesticides (Ag 20.03), list those which may be used by special permit only (Ag 29.04), and explain procedures for receiving emergency use permits (Ag 29.06) and special local need registrations of otherwise prohibited pesticides (Ag 29.08).

[13]Although this court has stated that a municipality can

This is especially true where the state and local laws do not conflict. Here, both the ordinance of the town of Casey and state law have the same spirit and purpose which is to protect human health and the environment. A specific example may be found in the comparison of sec. 93.07(9), Stats., which places upon the department the duty to comply with ch. 160 to protect groundwater supplies, and the laws of Wisconsin Act 410, Laws of 1984 secs. 19, 20 and 21[14] which encourage counties, towns and cities, respectively, to act to protect groundwater resources.

It is interesting to note that sec. 94.709, Stats., the aldicarb pesticide section, expressly promotes department research into this pesticide's transport and mitigation into groundwater. *See* secs. 94.709(5)(a)1 and 2. In that local governments are statutorily encouraged to protect their groundwater supplies, it stands to reason they are authorized to enact ordinances addressing, at least to this extent, local pesticide use.[15] Since it is reasonable to

neither forbid what state law sanctions nor sanction what state law forbids, it has also stated that municipalities can regulate in addition to state action. In *Fox v. Racine,* 225 Wis. 542, 546, 275 N.W. 513 (1937), we stated that:

> As a general rule, additional regulation to that of the state law does not constitute a conflict therewith. The fact that an ordinance enlarges upon the provisions of a statute by requiring more than the statute requires creates no conflict therewith, unless the statute limits the requirement for all cases to its own prescriptions. (Quoting 43 C.J. 219–20 sec. 220(b).)

[14]*See* Wis. Act. 410, Laws of 1984, sec. 19 (statute sec. 59.97(1)); Wis. Act. 410 Laws of 1984, sec. 20 (statute sec. 60.74(1)(a)7, now codified at sec. 60.61(1)(g), Stats., Wis. Act. 532, 538 Laws of 1983)); Wis. Act. 410, Laws of 1984, sec. 21 (statute sec. 62.23(7)(c)).

[15]Chapter 162, the Pure Water Act, stands in contrast to the clear encouragement to take action found in the statutes cited

assume municipalities may act to protect groundwater supplies, it would be an anomaly to find that these same municipalities cannot act to also protect their food supplies, homes, work and recreational areas from pesticide contamination. Where the state affirmatively authorizes emergency use permits or special local needs permits, local governments would be preempted from acting against such permits.[16] Since this was not the case relative to the town of Casey ordinance, I find no form of state preemption which works to void the local effectiveness of this enactment.

I am further unpersuaded by arguments that a call for uniformity effectively preempts local action in this area. Specifically, sec. 93.07(15), Stats., speaks to uniformity only in that it expressly provides that the Department of Agriculture will cooperate with local governments to try and achieve the goal of uniformity. Similarly, while sec. 93.07(1) entrusts the department with the duty to enforce ch. 94, the accompanying sec. 93.06(11), contemplates the adoption of local regulations by "political subdivisions of the state," the uniformity of which is to be secured through cooperation with those subdivisions by the department. Such provisions are certainly an antithesis of local government preemption.

Chapter 106 Laws of 1977 sec. 1, Statement of Purpose, provides that state regulations should not exceed any federal standards in that state regulations may not

*supra* at note 14 and accompanying text. Chapter 162, the Pure Water Act, expressly preempts (with small exception) cities, towns and villages from regulating in the area of construction and reconstruction of wells and other methods of obtaining groundwater for human consumption. *See* secs. 59.067(5) and 59.06(1), Stats.; *see generally* ch. 162.

[16]*See* Ag. 29.04 Wis. Adm. Code; Ag. 29.06 Wis. Adm. Code, Ag. 29.08 Wis. Adm. Code.

be more strict than federal rules. This is not uniformity.[17] Section 94.69 gives the Department of Agriculture authority to go beyond federal regulation.[18] This is not uniformity. Uniformity is a desired goal achieved through cooperation. Uniformity is not preemption since it does not involve conflict.

The town ordinance is a permitting, not a prohibitive, ordinance. The town is acting under its police powers when it grants or denies permits. The ordinance has the reasonable goal of trying to minimize risks to protect the health, safety and general welfare of the local citizens. The town board is not superseding the EPA labeling rules when it acts. The label is a restriction, not a general permit, and it is one factor taken into consideration by the town as it reviews a permit application. The town of Casey ordinance is not a blanket prohibition of pesticide use in the town. Rather, it is a valid, affirmative act under a local government's police powers to keep tabs on activities that may have a negative impact on the welfare of its citizens. For these reasons, I would uphold the ordinance.

---

[17]Chapter 106, Laws of 1977 sec. 1 Statement of Purpose reads:

> The legislature finds the need to update the regulation of the use and application of pesticides. It is the intent of the legislature that the State's regulations shall not exceed any federal standards adopted under the federal insecticide, fungicide, and rodenticide act or regulations issued under the act.

[18]Section 94.69, Stats., illustrates that the legislature did not intend the extent of state regulations to be limited to a mirror image of federal regulations. Subsecs. (6), (7), (10) and (12) contemplate state regulations different and beyond areas covered by federal regulation.

I am authorized to state that Justice William A. Bablitch joins this dissenting opinion.