Wisconsin's Environmental Decade, Inc., Petitioner: City of Madison, Petitioner-Appellant, v. Department of Natural Resources, and others, Respondents.

Supreme Court

No. 76–086. Argued October 3, 1978.—Decided October 31, 1978.
(Also reported in 271 N.W.2d 69.)

For the appellant there was a brief by *Henry A. Gempeler,* city attorney, and *Helen E. Gibson,* assistant city attorney, and oral argument by *Ms. Gibson.*

For respondents, Department of Natural Resources, Anthony S. Earl, and Alta E. Ehly, there was a brief by *Bronson C. La Follette,* attorney general, and *Linda M. Clifford,* assistant attorney general, and oral argument by *Linda H. Bockert,* assistant attorney general.

BEILFUSS, C. J.    In 1941 the legislature enacted sec. 144.025(2)(i), Stats. (then sec. 144.53(3) by ch. 307, Laws of 1941). This statute gave the responsible administrative agency (now the DNR) authority to issue permits and to "supervise chemical treatment of waters for the suppression of algae, aquatic weeds, swimmers' itch and other nuisance producing plants and organisms." As of June, 1975, no permit which met the administrative body's procedural requisites had ever been denied; neither had the department initiated chemical treatment by its own action or direction.

For several years prior to 1971 the department annually issued a "blanket permit" to the city for chemical treatment of Madison lakes. On January 12, 1971, the Common Council adopted Resolution No. 21.527

repudiating this practice and establishing a city policy of protesting and preventing the use of chemicals by others. The effect of this resolution is the central issue in this case. It provides as follows:

"RESOLVED: That it is the policy of the Common Council of the City of Madison to prohibit City Departments or subdivisions thereof the application of all herbicides and chemicals in Madison lakes except for reasons of public health as determined by the Health Department,
"and be it further,
"RESOLVED: That the City reject the annual blanket permit granted by the State of Wisconsin, Department of Natural Resources for the purpose of allowing individuals or governmental units to apply herbicide or chemical treatment to the Madison lakes,
"and be it further,
"RESOLVED: That the City of Madison file with the Department of Natural Resources a permanent objection for issuance of a permit for individuals or governmental units to apply herbicides or chemicals to Madison Lakes."

In 1974, DNR permits were applied for by Robert Wing and The Lake Biologist, Inc. (representing three separate groups), requesting authorization to chemically treat aquatic weeds along designated and limited parts of the shoreline of Lakes Mendota and Monona. The combined proposed treatment for both lakes was approximately 75 acres. The combined total of the two lakes is several thousand acres.

The city notified the DNR of its objection to the issuance of the permits. On July 31, 1974, an informal meeting was held where objections were made and alternative methods of weed control were discussed. All permits were approved and issued on August 6, 1974, for use the following year. The record contains the affidavit of the late Alta E. Ehly, then Director of the DNR's Southern District, that prior to issuance

of the permits he read the EIA reports on the application of the chemicals at the four sites, requested information from the Mayor of Madison concerning the granting of the permits, held a meeting to hear objections, and considered the comments of all interested parties.

On March 21, 1975, the city filed a petition for a writ of mandamus in Dane County Circuit Court to require the department to hold a public hearing on the permit approval orders as provided in sec. 144.56, Stats. The writ was granted on June 2, 1975, and the department suspended the orders pending the outcome of the review hearing.

On June 19, 20 and 21, 1975, a hearing was held before Examiner David Schwarz to review the necessity for and reasonableness of the permits issued by the department August 6, 1974.

At the hearing an extensive amount of testimony and evidence was received. Testimony was given by several people concerning the extreme nuisance condition caused by the weeds, which hinder motorboating, increase risk of serious boat motor burnout, produce offensive odors, render sailing impossible, and swimming uninviting—if not downright hazardous. The difficulties of mechanical harvesting were testified to. It was stated that mechanical harvesting was very time-consuming, costly ($68–$94 per acre), plagued by frequent machine clogging and breakdown, and of limited use in shallow areas under four and one-half feet deep. Expert witnesses on the nature of diquat, endothal, 2, 4–D, and copper sulfate were in substantial agreement that these chemicals are relatively non-toxic and would pose no hazard to nontarget species if properly applied. All four substances are registered with the EPA and all four are very effective for treatment of aquatic weeds. The record reveals the applicator to be an experienced professional, who

would have direct DNR supervision to guarantee proper application. The riparian municipalities of Westport, Middleton, Shorewood Hills, Monona, Maple Bluff and Dane County supported the use of chemicals for aquatic weed control. Only the City of Madison objected.

Based on the record of the hearing, the department made findings of fact and conclusions of law and ordered the issuance of modified permits to the original applicants for the same four areas of the two lakes.

On June 26, 1975, the city and Wisconsin's Environmental Decade jointly filed a petition for review of the department's findings, conclusions and order pursuant to sec. 144.56 (2) and ch. 227, Stats. Application for a stay of enforcement of the agency decision pending the determination on review was denied on June 30, 1975. On May 10, 1976, judgment was entered affirming the order of the DNR.

The issues presently before the court may be stated as follows:

Was the DNR's decision to issue permits for the chemical control of lake weeds in excess of its statutory authority or jurisdiction or affected by other error of law?

Is City of Madison Resolution No. 21.527 unconstitutional as an unlawful exercise of power and is it an enactment inconsistent with state statutes?

Does the record support Findings of Fact 8 and 9 that the chemicals permitted to be used are safe and effective and will not adversely affect water quality if treatments are properly applied?

The issues raised in the present case and the opposing positions taken by the parties concerning the appropriateness of alternative methods of water quality maintenance and general water management require analysis of the constitutional and statutory "division of power" between the Department of Natural Resources and the City of

Madison with respect to chemical treatment of aquatic weeds in Lakes Mendota and Monona.[1]

Title to the navigable waters of the state and to the beds of navigable waters is "vested and continues in the state of Wisconsin in trust for the use of the public." *Madison v. Wisowaty*, 211 Wis. 23, 27, 247 N.W. 527 (1933); *Diana Shooting Club v. Lamoreux*, 114 Wis. 44, 54, 89 N.W. 880 (1902). This "public trust" duty requires the state not only to promote navigation but also to protect and preserve its waters for fishing, hunting, recreation, and scenic beauty. *Muench v. Public Service Comm.*, 261 Wis. 492, 53 N.W.2d 514, 55 N.W.2d 40 (1952); *Just v. Marinette County*, 56 Wis.2d 7, 18, 201 N.W.2d 761 (1972). The state's responsibility in the area has long been acknowledged. However, increased leisure time, improved transportation facilities, the consequent growth of Wisconsin's water-centered recreation industry, and the continued deterioration of the quality of the waters of the state have awakened widespread interest in all Wisconsin's waters and have served to underscore the fact that maintaining pure and attractive rivers, lakes and streams is a matter of statewide concern.

---

[1] "The division of power between different levels of government makes possible the realization of certain basic values of a democratic state. Exercise of governmental power over people by two different levels of government, however, raises questions of how the power should be divided and whether a particular level is acting within its power. These questions as between the federal and state governments are dealt with by the United States Constitution, and cases interpreting it, and, to some degree, many federal statutes and much administrative law. As between state and local governments the division of power is controlled only by the state constitution, state statutes, state administrative law, and the courts' construction of these." Solheim, *Conflicts Between State Statute and Local Ordinance in Wisconsin*, 1975 Wis. L. Rev. 840.

In furtherance of the state's affirmative obligations as trustee of navigable waters, the legislature has delegated substantial authority over water management matters to the DNR.[2] The duties of the DNR are comprehensive, and its role in protecting state waters is clearly dominant. Relevant language of sec. 144.025, Stats., is as follows:

"**Department of natural resources—water resources.** (1) STATEMENT OF POLICY AND PURPOSE. The department of natural resources shall serve as the central unit of state government to protect, maintain and improve the quality and management of the waters of the state, ground and surface, public and private. Continued pollution of the waters of the state has aroused widespread public concern. It endangers public health and threatens the general welfare. A comprehensive action program directed at all present and potential sources of water pollution whether home, farm, recreational, municipal, industrial or commercial is needed to protect human life and health, fish and aquatic life, scenic and ecological values and domestic, municipal, recreational, industrial, agricultural and other uses of water. The purpose of this act is to grant necessary powers and to organize a comprehensive program under a single state agency for the enhancement of the quality management and protection of all waters of the state, ground and surface, public and private. To the end that these vital purposes may be accomplished, this act and all rules and orders promulgated pursuant thereto shall be liberally construed in favor of the policy objectives set forth in this act. . . .

"(2) POWERS AND DUTIES. (a) The department shall have general supervision and control over the waters of the state. It shall formulate no later than July 1, 1968, a long-range, comprehensive state water resources plan for each region, as fixed by the department under sub. (4), to guide the development, management and protection of water resources. Such plan shall thereafter be carried out by the department . . .The department also shall formulate plans and programs for the

[2] *See generally,* chs. 29, 30, 31, 33, 144, Stats.

prevention and abatement of water pollution and for the maintenance and improvement of water quality."

Sec. 144.025 (2) (i), Stats., expressly empowers the department to act in the area of chemical treatment, declaring in pertinent part:

"(i) The department shall supervise chemical treatment of waters for the suppression of algae, aquatic weeds, swimmers' itch and other nuisance-producing plants and organisms. . . ."

The city argues that the meaning of "supervise" here should be controlled by the decision in *La Crosse Rendering Works v. La Crosse,* 231 Wis. 438, 285 N.W. 393 (1939). In that case this court declared that sec. 146.11 (2), Stats. (1937), which provided that slaughterhouses and rendering plants were to be "inspected and supervised, as to location, construction and operation, by the state board of health" did not preclude a city from passing its own inspection regulations or from banning these businesses within its limits altogether. By analogy, appellant contends, the DNR's authority to "supervise chemical treatment" should not be construed to limit the city's legitimate police power to prevent all use of chemicals on the lakes within its jurisdiction.

The ultimate scope of a term capable of a broad or narrow meaning in the abstract must be determined by its context in a particular instance. The same word may receive a different construction in different statutes.[3] In *La Crosse Rendering Works, supra,* the meaning of "supervise" was circumscribed by the express language of another statute, sec. 66.05 (7), Stats. (1937), which specifically empowered city councils to regulate, inspect and prohibit "offensive industry." In contrast,

[3] *State ex rel. City Construction Co. v. Kotecki,* 156 Wis. 278, 146 N.W. 528 (1914); *Smith v. Whitewater,* 251 Wis. 313, 29 N.W.2d 37 (1947).

the term "supervise" in sec. 144.025(2)(i) requires an expansive interpretation in keeping with the broad authority conferred on the DNR and explicit legislative intent that the department serve as "the central unit of state government" in water quality and management matters. We believe it is implicit from the statutes cited above that the division of power between the state through its agent the DNR and the city must be resolved in favor of the state.

Further, it should be noted that pursuant to sec. 144.025(2)(i), Stats., the legislature has expressly sanctioned the chemical treatment of aquatic nuisances under the control of the DNR. A city cannot " '. . . lawfully forbid what the legislature has expressly licensed, authorized or required, or authorize what the legislature has expressly forbidden.' " *Fox v. Racine,* 225 Wis. 542, 545, 275 N.W. 513 (1937). Therefore, not only is sec. 144.025(2)(i) specific authority for the proposition that the DNR possesses the power to issue chemical treatment permits over the objections of the City of Madison, it is also persuasive evidence for the view that Madison may not legitimately forbid these legislatively authorized treatments in any case, regardless of the extent of the DNR's control.

The conclusion that the DNR does have authority to grant permits to chemically control aquatic nuisances despite a municipal policy to the contrary is solidly based on its own statutory ground and is fortified by judicial decision that "the state must maintain pre-eminence in the control of navigable waters in the state." *See Dept. of Natural Resources v. Clintonville,* 53 Wis.2d 1, 4, 191 N.W.2d 866 (1971).[4]

---

[4] *Muench v. Public Service Comm.,* 261 Wis. 492, 53 N.W.2d 514, 55 N.W.2d 40 (1952).

We conclude that sec. 144.025 (2) (i), Stats., vests express authority in the DNR to supervise chemical treatment of waters, based on the state's "public trust" duties, on the language of the statute itself, and on the major role the legislature has assigned to the DNR in matters of water management in general. The appellant, however, argues this authority has in fact been qualified and circumscribed by authority granted the City of Madison over the lakes which border it.[5]

Initially, it might be useful to point out what is not involved in this case. It does not involve the home-rule amendment to the constitution, sec. 3, Art. XI, Wis. Const. This amendment empowers municipalities to determine their ". . . local affairs . . . subject only to this constitution and to such enactments of the legislature of state-wide concern. . . ." "Local affairs" has been construed to include matters which primarily affect the people of the locality, in contrast to matters of "state-wide concern" which affect all the people of the state. *Muench v. Public Service Comm.*, 261 Wis. 492, 53 N.W.2d 514, 55 N.W.2d 40 (1952); *Van Gilder v. Madison*, 222 Wis. 58, 267 N.W. 25, 268 N.W. 108 (1936). While there exist situations where classification according to the above criteria might prove difficult, this case is not such a one. The quality of the waters of Lakes Mendota and Monona has a clear non-local impact and is emphatically a matter of state-wide concern. Whatever authority the City of Madison may exercise regarding the chemical treatment of noxious weeds on Madison lakes, it is not constitutional in nature. It must,

---

[5] The parties agreed that all the waters of Lakes Mendota and Monona are contained within the boundaries of the City of Madison by virtue of its Special Charter.

therefore, depend on a legislative grant of power.[6] Appellant city does not contest this.

The city contends the authority to prohibit chemical treatment of the lakes and the consequent validity of Resolution 21.527 derive from its Special Charter, Private and Local Laws of 1870, ch. 103, sec. 1 [in appellant's brief at page 5 listed as "Paragraph 26 of Chapter 322, Laws of 1880"], and from sec. 62.04 and sec. 62.11(5), Stats., of the General Charter Law. The relevant portion of the city's Special Charter reads as follows:

". . . the common council shall have jurisdiction over the entire lakes bordering on the city, and may enact and enforce such ordinances or by-laws for the preservation of fish in the waters thereof or outlets between the same, so as to prohibit, regulate or license the taking or killing of fish in the waters thereof at any time; and may also, by ordinance or resolution, prevent any deterioration of the said waters, or any nuisances being cast therein, by which the health of the inhabitants of the city or the purity of the water shall be impaired, as they shall deem expedient."

While this Special Charter was repealed, its effect was ultimately preserved by sec. 62.04, Stats., which provides in its entirety:

"**Intent and construction.** It is declared to be the intention of the revision of the city charter law, to grant

---

[6] "A municipal corporation . . . has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator." *Williams v. Mayor*, 289 U.S. 36, 40 (1933); *State ex rel. Martin v. Juneau*, 238 Wis. 564, 300 N.W. 187 (1941). Furthermore, in Wisconsin, municipalities have no inherent right of self-goverment which is beyond the legislative control of the state. *Van Gilder v. Madison, supra*, citing *Hunter v. Pittsburgh*, 207 U.S. 161 (1907). *See also Madison Metropolitan Sewerage Dist. v. Committee*, 260 Wis. 229, 242, 50 N.W.2d 424 (1951).

all the privileges, rights and powers, to cities which they heretofore had unless the contrary is patent from the revision. For the purpose of giving to cities the largest measure of self-government compatible with the constitution and general law, it is hereby declared that sections 62.01 to 62.26, inclusive, shall be liberally construed in favor of the rights, powers and privileges of cities to promote the general welfare, peace, good order and prosperity of such cities and the inhabitants thereof."

The final statutory provision on which the city relies is sec. 62.11 (5), Stats.

"POWERS. Except as elsewhere in the statutes specifically provided, the council shall have the management and control of the city property, finances, highways, navigable waters and the public service, and shall have power to act for the government and good order of the city, for its commercial benefit, and for the health, safety, and welfare of the public, and may carry out its powers by license, regulation, suppression, borrowing of money, tax levy, appropriation, fine, imprisonment, confiscation, and other necessary or convenient means. The powers hereby conferred shall be in addition to all other grants, and shall be limited only by express language."

The effect of these statutes was concisely summarized by the revisor of statutes in Wisconsin Annotations (1950) 338, cited by this court in *Smith v. Wisconsin Rapids*, 273 Wis. 58, 60–61, 76 N.W.2d 595 (1956):

" 'Prior to the enactment of this section by ch. 242, Laws 1921 (revision of City Charter Law) cities possessed specified powers. Their powers were limited to those expressed in the statutes and those necessarily implied by the expressed powers. All other powers were regarded as having been denied. That rule was changed by said chapter. Since then cities possess all powers not denied them by the statutes or the constitution. Instead

of the powers being specified, as formerly, the limitations are now enumerated.' "[7]

In analyzing what powers the legislature could confer on Madison and whether primary jurisdiction over the quality of the waters of Lakes Mendota and Monona is in fact one such power, it should be understood that an otherwise legitimate exercise of this "general charter" power by the city is not rendered invalid and constitutionally defective merely because it deals with a matter of state-wide concern.[8] Indeed, sec. 62.11(5), Stats., would be a nullity if it were construed to confer on municipalities only that authority which related to "local affairs" since that power is already constitutionally guaranteed by the home-rule amendment.

Preventing pollution and protecting the quality of the waters of the state are valid police-power concerns, as well as being part of the state's affirmative duty under the "public trust" doctrine. As a general matter, the police power of the state which may be constitutionally delegated by the legislature and legitimately exercised by municipalities extends to matters of public safety, health, and general welfare.[9] More specifically, particularly in light of the express declaration of sec. 62.11(5), Stats., that "[e]xcept as elsewhere in the statutes spe-

[7] In *Hack v. Mineral Point*, 203 Wis. 215, 219, 233 N.W. 82 (1931), the court was equally emphatic. *See also Fiore v. Madison*, 264 Wis. 482, 59 N.W.2d 460 (1953).

[8] This is not to imply that the jurisdiction and authority of a city is not limited to the territory within its boundaries. It is. *Safe Way Motor Coach v. Two Rivers*, 256 Wis. 35, 39 N.W.2d 847 (1949). Its ordinances have no extra-territorial effect. *Cegelski v. Green Bay*, 231 Wis. 89, 285 N.W. 343 (1939).

[9] *Highway 100 Auto Wreckers v. West Allis*, 6 Wis.2d 637, 96 N.W.2d 85, 97 N.W.2d 423 (1959).

cifically provided, the council shall have the management and control of . . . navigable waters. . . ." the legislature may legitimately delegate authority to local units of government to act in matters involving the state's "public trust" duties—provided that the delegation is in furtherance of the trust and will not block the advancement of paramount interests.[10]

We believe that the power to prohibit chemical treatment of aquatic nuisances in the waters of Lakes Mendota and Monona is one which the legislature could confer on Madison and, therefore, is one which the city now possesses under sec. 62.11(5), Stats., unless as prescribed in sec. 62.11(5) itself, there is "express language" elsewhere in the statutes restricting or revoking it. This court has added a further limit on a municipality's exercise of authority pursuant to the legislature's broad grant of power in sec. 62.11(5), Stats.: i.e., ordinances may not " 'infringe the spirit of a state law or . . . general policy of the state.' " *Fox v. Racine,* 225 Wis. 542, 545, 275 N.W. 513 (1937).

We approve of the rule as set forth by Solheim, *Conflicts Between State Statutes and Local Ordinance in Wisconsin,* 1975 Wis. L. Rev. 840, 848:

"2. If a municipality acts within the legislative grant of power but not within the constitutional initiative, the state may withdraw the power to act; so if there is logically conflicting legislation, or an express withdrawal of power, the local ordinance falls. Furthermore, if the state legislation does not logically conflict, or does not

---

[10] *Cf. Muench v. Public Service Comm.,* 261 Wis. 492, 53 N.W.2d 514, 55 N.W.2d 40 (1952), as clarified and limited by *Menzer v. Elkhart Lake,* 51 Wis.2d 70, 186 N.W.2d 290 (1971). *See also Madison v. Tolzmann,* 7 Wis.2d 570, 575, 97 N.W.2d 513 (1959).

expressly withdraw power, it is possible that the local ordinance nevertheless must fall if an intent that such an ordinance not be made can be inferred from the fact that it defeats the purpose or goes against the spirit of the state legislation."

If Resolution 21.527 establishes a city policy to effectively prevent the use of herbicides or chemical treatment in Madison lakes, we conclude that the resolution must fall. The statutes reveal no express withdrawal of power. However, the broad grant of power to the DNR to "supervise chemical treatment of waters" under sec. 144.025 (2) (i), Stats., is logically inconsistent with the existence of power in the city to prevent chemical treatment of Madison lakes entirely. The city's policy conflicts with the DNR's program under sec. 144.025 (2) (i) involving limited chemical treatment by individuals or groups operating by permit and under the supervision of the department. The city contends that Resolution 21.527 and sec. 144.025 (2) (i), Stats., are not logically inconsistent. We do not believe this contention is sound. The city has not " '. . . moved in the same direction . . . farther but not counter to . . . .' " the DNR. *Cf. Fox v. Racine,* 225 Wis. at 546, citing *Caeredes v. Platteville,* 213 Wis. 344, 349–351, 251 N.W. 245 (1933). The resolution and the statute as implemented by the DNR are diametrically opposed. The city's reliance on *Fox v. Racine* and *La Crosse Rendering Works v. La Crosse,* 231 Wis. 438, 285 N.W. 393 (1939), where this court upheld municipal ordinances which were not in logical conflict with the state statute, is inappropriate in light of the facts of this case.

Even assuming that sec. 144.025 (2) (i), Stats., is not logically conflicting legislation, Resolution 21.527 nevertheless is invalid. Allowing the City of Madison to prevent treatment which the DNR has authorized, and thereby frustrate the department's program of water resource management, defeats clear legislative purpose to estab-

lish the department as "the central unit of state government" with "general supervision and control over the waters of the state." *Cf*. sec. 144.025(1) and (2) (a). This legislative intent, clear in ch. 144, may also be evinced from the broad supervisory powers bestowed on the DNR in other aspects of water management.[11]

The city's position that its power of management and control over Lakes Mendota and Monona supersedes the

[11] *Cf*. chs. 29, 30, 31, 33. Ch. 33, *Public Inland Lake Protection and Rehabilitation*, provides a striking example, particularly telling in the present case. The relevant language of two of the sections is worth citing:

"33.001 *Declaration of intent*. The legislature finds environmental values, wildlife, public rights in navigable waters, and the public welfare are threatened by the deterioration of public lakes; that the protection and rehabilitation of the public inland lakes of this state are in the best interest of the citizens of this state; that the public health and welfare will be benefited thereby, that the current state effort to abate water pollution will not undo the eutrophic and other deteriorated conditions of many lakes; that lakes form an important basis of the state's recreation industry; that the increasing recreational usage of the waters of this state justifies state action to enhance and restore the potential of our inland lakes to satisfy the needs of the citizenry; and that the positive public duty of this state as trustee of waters requires affirmative steps to protect and enhance this resource and protect environmental values. To this end, the legislature declares that it is necessary to embark upon a program of lake protection and rehabilitation, to authorize a conjunctive state and local program of lake protection and rehabilitation to fulfill the positive duty of the state as trustee of navigable waters, and protect environmental values . . . The legislature further finds that state efforts are needed to aid and assist local efforts, to ensure that projects are undertaken only if they promote the public rights in navigable waters, environmental values, and the public welfare, . . ."

"33.15 *Implementation*. (1) No plan developed under this subchapter may be formally adopted for implementation by the district until the department has approved the plans or whatever modification it believes appropriate. . . ."

authority of the DNR in the particular matter of chemical treatment of aquatic weeds runs counter to the clear legislative pattern of vesting increasingly centralized authority over waters of the state in the DNR, and is logically inconsistent with sec. 144.025 (2) (i), Stats.

The city challenges the sufficiency of the evidence to support the two findings of fact by the DNR. These findings of fact are as follows:

"8. Diquat, endothal compounds, 2, 4–D and copper sulfate are effective in control of over abundant nuisance growths of aquatic weeds and algae on a short term basis. Said chemical products are registered as safe and effective (when limited to dosages printed on the label) for the purposes requested in these permits by the United States Environmental Protection Agency. In addition, no substantial evidence exists indicating that said dosages of these chemicals will harm non-target organisms when applied under proper conditions and with supervision.

"9. Chemical treatment of the areas proposed will not cause oxygen depleting conditions in the lakes which would be of a magnitude sufficient to injure fish. The proposed treatment will not adversely affect water quality nor will it increase water pollution in Lakes Mendota and Monona, nor will it cause environmental pollution as defined by Section 144.30 (9), Wisconsin Statutes, if the treatments are accomplished in accordance with the permits herein."

Essentially the city contends that the italicized conditional language required an independent finding by the department that the applicator and the supervisors had the capability of effecting a "proper application," which finding could not be made from the evidence in the record.

The permits issued by the DNR contained detailed conditions to assure accuracy of application, and required direct supervision by a DNR representative. A

DNR technical booklet outlined the proper methods for achieving exact chemical mixes. However, a department witness testified that the instructions are not always followed.

The applicator, Mr. Schein, had seventeen years experience in lake management, ten as a DNR biologist, seven as the owner of The Lake Biologists, Inc. His company currently manages 42 lakes throughout Wisconsin and Minnesota. He testified extensively concerning how he would apply the chemicals, how he calculated the proper concentration, how he gauged area, depth, and boat speed. He admitted that he measured all these factors to a large extent by "experience over the years." In addition, he gauged chemical strength by the color of the mixture, dimensions by measuring on a map and comparing shoreline lots and landmarks, depth by using a long pole and a rope with knots in it.

In deciding whether there is "substantial evidence" to support an administrative decision, the test is basically whether reasonable minds could arrive at the same conclusion as the agency.[12] Ch. 227 review standards do not allow a reviewing court to weigh the evidence or pass on the credibility of witnesses.

The present record is not without conflict on the issue of "proper application." The appellant challenges the testimony of Mr. Schein which suggests he relies as much on his years of experience as he does on more scientific tools. However, the applicator was a seasoned professional—one for whom the eye of experience is a precision instrument. His testimony, taken as a whole, supports the finding—logically implicit in the department's ultimate order granting the permit—that under his direc-

---

[12] *Daly v. Natural Resources Board*, 60 Wis.2d 208, 219, 208 N.W.2d 839 (1973); *Superior v. ILHR Dept.*, 84 Wis.2d 663, 267 N.W.2d 637 (1978).

tion the chemical "treatment could be accomplished in accordance with the permits" and the chemicals could be "limited to dosages presented on the label" and "applied under proper conditions."

There is substantial evidence in the record, and the DNR implicitly found that the chemical could be properly applied.

The issuance of permits for chemical treatment of aquatic weeds in Madison lakes is well within the authority of the DNR, and a legitimate exercise of its power to supervise chemical treatment of waters under sec. 144.025 (2) (i), Stats. In light of the express language of this statute and the clear legislative purpose to centralize overall water resource management under the DNR, Resolution No. 21.527 must fall—the power to enact it pursuant to secs. 62.04 and 62.11 (5) having been withdrawn from the city by the legislature. The findings of the DNR are supported by substantial evidence and its order should be affirmed.

*By the Court.*—Judgment affirmed.

ABRAHAMSON, J., took no part.