DeRosso Landfill Company, Inc., and Gordon DeRosso, Plaintiffs-Respondents,†

v.

City of Oak Creek, Defendant-Appellant.

Court of Appeals

*No. 94–0440. Oral argument December 20, 1994.—Decided January 10, 1995.*

(Also reported in 528 N.W.2d 468.)

†Petition to review granted.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Lawrence J. Haskin*, city attorney. There was oral argument by *Lawrence J. Haskin*.

On behalf of the plaintiffs-respondents, the cause was submitted on the briefs of *Hugh R. Braun* and *Beth A. Thorson* of *Godfrey, Braun & Hayes*, of Milwaukee. There was oral argument by *Hugh R. Braun*.

Before Sullivan, Fine and Schudson, JJ.

FINE, J.   The City of Oak Creek appeals from a permanent injunction entered by the trial court prohibiting Oak Creek from preventing DeRosso Landfill

Company and Gordon DeRosso, DeRosso Landfill's sole stockholder, from filling with clean fill a 300,000 cubic yard hole on ten acres owned by Gordon DeRosso. We reverse.

The facts are not disputed. The hole is currently filled with water, and is a pond. It was excavated to supply material needed to cap a forty-acre solid-waste landfill site owned by DeRosso Landfill in Oak Creek across the street. The landfill site was ordered capped and closed by the Department of Natural Resources in 1989. In its order, the Department required that DeRosso submit a plan for the land from which the capping material was to be excavated, known as the "borrow source."[1] In October of 1993, the Department gave approval to DeRosso to fill the borrow source with "[o]nly clean fill as defined in NR 500.08(2)(a), Wis. Adm. Code" ("clean soil, brick, building stone, concrete, reinforced concrete, broken pavement, and unpainted or untreated wood") so as "to restore the borrow source to its original grades." An Oak Creek ordinance prohibits DeRosso from doing this. The only issue on this appeal is whether Oak Creek's authority to prevent DeRosso from filling the borrow source is preempted by

[1] Contrary to DeRosso's representation in its brief, this 1989 order did not "direc[t] DeRosso to fill the borrow source to grade and restore the premises." Rather, the only reference in that order as to what should be done with the borrow source after its excavation was the direction that "DeRosso shall submit a proposal for abandonment of the clay borrow source in accordance with NR 512.18(3)(e) Wis. Adm. Code within 90 days from the date of this approval." WISCONSIN ADM. CODE NR § 512.18(3)(e) requires the ultimate "proper abandonment" of a borrow source. It does not, however, specify what that is.

state law.[2] This is a matter that we decide *de novo.* *See Chicago, Milwaukee, St. Paul and Pacific Railroad Co. v. City of Milwaukee*, 47 Wis. 2d 88, 96, 176 N.W.2d 580, 583 (1970) (application of law to undisputed facts).

The legislature has granted to municipalities significant powers of home rule. Thus, the common council of each municipality has the "power to act . . . for the health, safety, and welfare of the public, and may carry out its powers by license, regulation, . . . and other necessary or convenient means." Section 62.11(5), STATS.[3] Section 62.11(5) works in tandem with Article XI, § 3(1) of the Wisconsin Constitution, which permits municipalities to "determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of statewide concern as with uniformity shall affect every city or every village."[4]

---

[2] The reasonableness or lawfulness of the ordinance is not otherwise at issue.

[3] Section 62.11(5), STATS., reads in full:

POWERS. Except as elsewhere in the statutes specifically provided, the council shall have the management and control of the city property, finances, highways, navigable waters, and the public service, and shall have power to act for the government and good order of the city, for its commercial benefit, and for the health, safety, and welfare of the public, and may carry out its powers by license, regulation, suppression, borrowing of money, tax levy, appropriation, fine, imprisonment, confiscation, and other necessary or convenient means. The powers hereby conferred shall be in addition to all other grants, and shall be limited only by express language.

[4] Article XI, section 3(1) of the Wisconsin Constitution reads in full:

Cities and villages organized pursuant to state law may determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of statewide

The power granted to municipalities by § 62.11(5), however, is broader than that granted by Article XI, § 3(1), because § 62.11(5) "would be a nullity if it were construed to confer on municipalities only that authority which related to 'local affairs' since that power is already constitutionally guaranteed by" Article XI, § 3(1). *Wisconsin's Environmental Decade v. Department of Natural Resources*, 85 Wis. 2d 518, 533, 271 N.W.2d 69, 76 (1978). Thus, § 62.11(5) "does not limit a municipality's authority to act only in 'local affairs,' " and, accordingly, an "ordinance may be authorized by sec. 62.11(5), Stats., notwithstanding statewide concern in the matter it regulates." *Anchor Sav. & Loan Ass'n v. Equal Opportunities Comm'n, City of Madison*, 120 Wis. 2d 391, 395–396, 355 N.W.2d 234, 237 (1984). There is a four-part test in evaluating whether a municipality may regulate a matter of state-wide concern:

(1) whether the legislature has expressly withdrawn the power of municipalities to act;

(2) whether the ordinance logically conflicts with the state legislation;

(3) whether the ordinance defeats the purpose of the state legislation; or

(4) whether the ordinance goes against the spirit of the state legislation.

*Id.*, 120 Wis. 2d at 397, 355 N.W.2d at 238.

■

The establishment of solid-waste facilities is a matter of statewide concern. Section 144.445(5), STATS. The trial court found that DeRosso's plan to place clean

concern as with uniformity shall affect every city or every village. The method of such determination shall be prescribed by the legislature.

fill in the pond made the pond a solid-waste facility. None of the parties disagrees with this conclusion. Thus, as Oak Creek concedes in its brief, issues surrounding the use and future of the borrow source are matters of statewide concern. Nevertheless, Oak Creek has significant interests in protecting its community and the local environment. Oak Creek can protect those interests as long as that does not run afoul of the four-part *Anchor Savings* test, to which we now turn.

    1.    *Has the legislature "expressly withdrawn the power" of Oak Creek to impose conditions on the restoration of the borrow source?*

The legislature has specifically recognized that "the proper management" of solid-waste disposal sites "is necessary to prevent adverse effects on the environment and to protect public health and safety," § 144.445(1)(c), STATS., and that local authorities have significant responsibilities in this regard:

> The legislature further finds that local authorities have the responsibility for promoting public health, safety, convenience and general welfare, encouraging planned and orderly land use development, recognizing the needs of industry and business, including solid waste disposal and the treatment, storage and disposal of hazardous waste and that the reasonable decisions of local authorities should be considered in the siting of solid waste disposal facilities and hazardous waste facilities.

Section 144.445(1)(f), STATS. Thus, local communities have the right to have their interests considered in the siting and operation of solid-waste facilities that are subject to regulation by the Department. *See* §§ 144.445(5)–144.445(10), STATS. The Department, however, may exempt certain solid-waste facilities "from regulation under ss. 144.43 to 144.47." Section

144.44(7)(g), STATS.[5] Under this authority, the Department has, by rule, exempted clean-fill solid-waste disposal sites from "licensing and the requirements of chs. NR 500 to 522." WIS. ADM. CODE NR § 500.08(2).[6] The trial court held that the borrow source is within

---

[5] Section 144.44(7), STATS., provides, as material here:

(g) *Exemption from regulation; low-hazard waste.* 1. The department shall conduct a continuing review of the potential hazard to public health or the environment of various types of solid wastes and solid waste facilities. The department shall consider information submitted by any person concerning the potential hazard to public health or the environment of any type of solid waste.

2. If the department, after a review under subd. 1, finds that regulation under ss. 144.43 to 144.47 is not warranted in light of the potential hazard to public health or the environment, the department shall either:

a. Promulgate a rule specifying types of solid waste that need not be disposed of at a licensed solid waste disposal facility.

b. On a case-by-case basis, exempt from regulation under ss. 144.43 to 144.47 specified types of solid waste facilities.

c. Authorize an individual generator to dispose of a specified type of solid waste at a site other than a licensed solid waste disposal facility.

[6] As pertinent to this appeal, WIS. ADM. CODE NR § 500.08(2) provides:

OTHER FACILITIES. The following facilities must be established with the locational requirements of s. NR 504.04(3)(c) and (4)(a) to (e) and must be operated and maintained in a nuisance-free and aesthetic manner but are exempt from licensing and the requirements of chs. NR 500 to 522:

(a) Facilities where only clean soil, building stone, concrete, reinforced concrete, broken pavement, and unpainted or untreated wood are disposed.

(b) Facilities for the exclusive disposal of spoils from sand, gravel or stone and crushed stone quarry operations and similar nonmetallic earth materials.

As noted, the Department gave approval to DeRosso to fill the borrow source with "[o]nly clean fill as defined in NR 500.08(2)(a), Wis. Adm Code."

the scope of this exemption, and concluded that DeRosso did not have to comply with WIS. ADM. CODE NR § 512.06(1) and "apply for all applicable local approvals specified by a municipality under s. 144.44(1m)(b), Stats."[7] Accordingly, the trial court determined that the legislature had withdrawn Oak Creek's power to regulate the borrow source. We disagree.

Section 144.44(1m)(b), STATS., and WIS. ADM. CODE NR § 512.06(1) require those who seek to operate a solid-waste facility to request from "each affected municipality" a list of local laws that would affect or regulate that facility ("local approvals"). This request triggers the negotiation, mediation, and arbitration procedures imposed by §§ 144.445(5), (9) & (10), STATS. Under these provisions, however, an operator's compliance with local laws purporting to regulate the sites is hardly compelled (except for local regulations that predate "by at least 15 months" the earlier of an applicant's submission of either a feasibility report or an initial site report, unless the local regulations are "specified as inapplicable in a negotiation agreement

---

[7] Section 144.44(1m)(b), STATS., provides:

*Application for local approvals required.* Prior to constructing a solid waste disposal facility or hazardous waste facility, the applicant shall submit a written request for the specification of all applicable local approvals to each affected municipality. Within 15 days after the receipt of a written request from the applicant, a municipality shall specify all local approvals for which applications are required or issue a statement that there are no applicable local approvals. Prior to constructing a solid waste disposal facility or a hazardous waste facility, the applicant shall apply for each local approval required to construct the waste handling portion of the facility.

"Local approvals" are local regulations that apply to proposed waste disposal sites. *See* § 144.445(3)(d), STATS. They are subject to the negotiation, mediation, and arbitration procedures imposed by §§ 144.445(5), (9) & (10), STATS.

54

approved under [§ 144.445] subd.(9) or an arbitration award issued under [§ 144.445] subd.(10)"—*see* § 144.445(3)(fm) & (5)(c) & (d)). To the contrary, because the siting and operation of solid-waste facilities is a matter of statewide concern, the legislature—in an attempt to strike a balance between statewide and local interests—has subjected potential operators and localities to the forced resolution of their respective positions.[8] *See Madison Landfills, Inc. v.*

---

[8] Sections 144.445(5), (9) & (10), STATS., provide:

    (5) APPLICABILITY OF LOCAL APPROVALS. (a) The establishment of facilities is a matter of statewide concern.

    (b) An existing facility is not subject to any local approval except those local approvals made applicable to the facility under pars. (c) to (g). ·

    (c) Except as provided under par. (d), a new or expanded facility is subject to preexisting local approvals.

    (d) A new or expanded facility is not subject to any preexisting local approvals which are specified as inapplicable in a negotiation agreement approved under sub. (9) or an arbitration award issued under sub. (10).

    (e) Except as provided under par. (f), a new or expanded facility is not subject to any local approvals which are not preexisting local approvals.

    (f) A new or expanded facility is subject to local approvals which are not preexisting local approvals if they are specified as applicable in a negotiation agreement approved under sub. (9).

    (g) This subsection applies to a new or expanded facility owned or operated by a county in the same manner it applies to all other new or expanded facilities.

    (9) NEGOTIATION. (a) *Commencement of negotiation.* Negotiation between the applicant and the local committee may commence at any time after receipt of notification of participation from the board under sub. (6) (b). The time and place of negotiating sessions shall be established by agreement between the applicant and the local committee. Negotiating sessions shall be open to the public.

    (b) *Determination of negotiability.* Either party may petition the board in writing for a determination as to whether a proposal is excluded from negotiation under sub. (8) (a). A petition may be

submitted to the board before a proposal is offered in negotiation. A petition may not be submitted to the board later than 7 days after the time a proposal is offered for negotiation. The board shall conduct a hearing on the matter and issue its decision within 14 days after receipt of the petition. The decision of the board is binding on the parties and is not subject to judicial review. Negotiation on any issue, including issues subject to a petition under this paragraph, may continue pending the issuance of the board's decision.

(c) *Mediation.* Negotiating sessions may be conducted with the assistance of a mediator if mediation is approved by both the applicant and the local committee. Either the applicant or the local committee may request a mediator at any time during negotiation. The function of the mediator is to encourage a voluntary settlement by the applicant and the local committee. The mediator may not compel a settlement. The board shall provide the applicant and the local committee with the names and qualifications of persons willing to serve as mediators. If the applicant and the local committee cannot agree on the selection of a mediator, the applicant and the local committee may request the board to appoint a mediator.

(d) *Mediation costs.* The mediator shall submit a statement of his or her costs to the applicant, the local committee and the board. Except as otherwise specified in the negotiated agreement or the arbitration award under sub. (10), the costs of the mediator shall be shared equally between the applicant and the local committee. The local committee's share of the mediator's costs shall be divided among the participating municipalities in proportion to the number of members appointed to the local committee by each participating municipality.

(e) *Failure to participate; default.* Failure of the applicant or the local committee to participate in negotiating sessions constitutes default except as provided in this paragraph. It is not default if the applicant or the local committee fails to participate in negotiating sessions either for good cause or if further negotiations cannot be reasonably expected to result in a settlement. Either party may petition the board in writing for a determination as to whether a given situation constitutes default. The board shall conduct a hearing in the matter. Notwithstanding s. 227.03 (2), the decision of the board on default is subject to judicial review under ss. 227.52 to 227.58. If the applicant defaults, the applicant may not construct the facility. If the local committee defaults, the applicant may continue to seek state approval of the facility, is not

56

tration is the final step in the statutory scheme for landfill siting."); *see also id.*, 188 Wis. 2d at 628-634,

required to continue to negotiate or arbitrate under this section and the facility is not subject to any local approval, notwithstanding sub. (5).

(em) *Default hearing costs.* The board shall submit to the applicant and local committee a statement of the costs of a hearing held under par. (e) to determine whether the failure of an applicant or a local committee to participate in the negotiation sessions under this subsection constitutes default. Except as otherwise specified in an arbitration award, the costs of a hearing to determine whether a given situation constitutes default shall be shared between the applicant and the local committee. The local committee's share of the hearing costs shall be divided among the participating municipalities in proportion to the number of members appointed to the local committee by each participating municipality.

(f) *Submission of certain items to the department.* Any item proposed to be included in a negotiated agreement which affects an applicant's responsibilities under an approved feasibility report or plan of operation may be submitted to the department for consideration. An item may be submitted to the department under this paragraph after agreement on the item is reached by the applicant and the local committee either during or at the conclusion of negotiation. The department shall approve or reject items submitted under this paragraph within 2 weeks after receipt of the item. The department shall reject those items which would make the applicant's responsibilities less stringent than required under the approved feasibility report or plan of operation. The department shall provide written reasons for the rejection. Items which are rejected may be revised and resubmitted. The department may incorporate all items which are not rejected under this paragraph into the approved feasibility report or the plan of operation. The department shall inform the applicant, the local committee and the board of its decisions under this paragraph.

(g) *Written agreement.* All issues subject to negotiation which are resolved to the satisfaction of both the applicant and the local committee and, if necessary, are approved by the department under par. (f), shall be incorporated into a written agreement.

(h) *Public hearings.* The local committee may hold public hearings at any time concerning the agreement in any town, city or village where all or a portion of the facility is to be located.

57

(i) *Submission for approval.* Within 2 weeks after approval of the written agreement by the applicant and the local committee, the local committee shall submit the negotiated agreement to the appropriate governing bodies for approval.

(j) *Appropriate governing bodies for approval.* If the local committee includes members from a town, city or village where all or a portion of the facility is to be located, the appropriate governing bodies consist of the governing body of each town, city or village where all or a portion of the facility is to be located with members on the local committee. If the local committee does not include members from any town, city or village where all or a portion of the facility is to be located, the appropriate governing bodies consist of the governing body of each participating town, city or village.

(k) *Approval.* If the local committee includes members from any town, city or village where all or a portion of the facility is to be located and if the negotiated agreement is approved by resolution by each of the appropriate governing bodies, the negotiated agreement is binding on all of the participating municipalities but if the negotiated agreement is not approved by any appropriate governing body, the negotiated agreement is void. If the local committee does not include members from any town, city or village where all or a portion of the facility is to be located and if the negotiated agreement is approved by resolution by all of the appropriate governing bodies, the agreement is binding on all of the participating municipalities but if the negotiated agreement is not approved by all of the appropriate governing bodies, the negotiated agreement is void.

(L) *Submission of agreement to board and department.* The applicant shall submit a copy or notice of any negotiated agreement approved under par. (k) to the board and the department by mail within 10 days after the agreement is approved.

(10) ARBITRATION. (a) *Joint petition for arbitration.* If agreement is not reached on any items after a reasonable period of negotiation, the applicant and the local committee may submit a joint written petition to the board to initiate arbitration under this subsection.

(b) *Unilateral petition for arbitration.* Either the applicant or the local committee may submit an individual written petition to the board to initiate arbitration under this subsection but not ear-

lier than 120 days after the local committee is appointed under sub.
(7) (a).

(c) *Decision concerning arbitration.* Within 15 days after
receipt of a petition to initiate arbitration, the board shall issue a
decision concerning the petition and notify the applicant and the
local committee of that decision.

(d) *Order to continue negotiation.* The board may issue a deci-
sion ordering the applicant and the local committee to continue
negotiating for at least 30 days after the date of the notice if, in the
judgment of the board, arbitration can be avoided by the negotia-
tion of any remaining issues. If the board issues a decision ordering
the applicant and the local committee to continue negotiation, the
petition to initiate arbitration may be resubmitted after the
extended period of negotiation.

(e) *Decision to delay arbitration pending submittal of feasi-
bility report.* The board may issue a decision to delay the initiation
of arbitration until the department notifies the board that it has
received a feasibility report for the facility proposed by the appli-
cant. The board may decide to delay the initiation of arbitration
under this paragraph if the applicant has not made available infor-
mation substantially equivalent to that in a feasibility report. The
petition to initiate arbitration may be resubmitted after the feasi-
bility report is submitted.

(f) *Order for final offers.* The board may issue a decision
ordering the applicant and the local committee to submit their
respective final offers to the board within 90 days after the date of
the notice.

(g) *Failure to submit final offer.* If the local committee fails to
submit a final offer within the time limit specified under par. (f),
the applicant may continue to seek state approval of the facility, is
not required to continue to negotiate or arbitrate under this section
and the facility is not subject to any local approval, notwithstand-
ing sub. (5). If the applicant fails to submit a final offer within the
time limit specified under par. (f), the applicant may not construct
or operate the facility.

(h) *Final offers.* A final offer shall contain the final terms and
conditions relating to the facility proposed by the applicant or the
local committee and any information or arguments in support of
the proposals. Additional supporting information may be submit-
ted at any time.

59

exempt facilities as they would have been if that scheme did not exist. Rather than withdraw Oak

(i) *Issues and items in final offer.* A final offer may include only issues subject to arbitration under sub. (8). A final offer may include only items offered in negotiation except that a final offer may not include items settled by negotiation and approved under sub. (9) (k).

(j) *Continued negotiation; revised final offers.* Negotiation may continue during the arbitration process. If an issue subject to negotiation is resolved to the satisfaction of both the applicant and the local committee and, if necessary, is approved by the department under sub. (9) (f), it shall be incorporated into a written agreement and the final offers may be amended as provided under par. (n).

(k) *Public hearings.* The local committee may conduct public hearings on the proposed final offer prior to submitting the final offer to the governing bodies under par. (L).

(L) *Submission for approval.* The final offers prepared by the local committee are required to be submitted for approval by resolution of the governing body of each participating municipality before the final offer is submitted to the board.

(m) *Public documents.* The final offers are public documents and the board shall make copies available to the public.

(n) *Amendment of offer.* After the final offers are submitted to the board, neither the applicant nor the local committee may amend its final offer, except with the written permission of the other party. Amendments proposed by the local committee are required to be approved by the participating municipality to which the amendment relates. If the governing body of any participating municipality fails to approve the final offer prepared by the local committee, the applicant may amend those portions of his or her final offer which pertain to that municipality without obtaining written permission from the local committee.

(o) *Public meeting.* Within 30 days after the last day for submitting final offers, the board shall conduct a public meeting in a place reasonably close to the location of the facility to provide an opportunity for the applicant and the local committee to explain or present supporting arguments for their final offers. The board may conduct additional meetings with the applicant and the local committee as necessary to prepare its arbitration award. The board may administer oaths, issue summonses under s. 788.06 and direct the taking of depositions under s. 788.07.

60

Creek's power to regulate the borrow source, as the trial court concluded, the exemption merely restores Oak Creek's pre-existing authority to regulate the use of land within its borders so as to promote and secure "the health, safety, and welfare" of its community. *See* § 62.11(5), STATS.; *see also* WIS. CONST. art. XI, § 3(1); *see, e.g. Nelson v. Department of Natural Resources*, 88 Wis. 2d 1, 4, 10, 276 N.W.2d 302, 303-304, 306 (Ct. App. 1979) (under then-existing law, Department of Natural Resources did not have power to contravene county ordinances prohibiting use of certain lands as solid-waste disposal sites), *aff'd*, 96 Wis. 2d 730, 292 N.W.2d 655. Thus, in its letter to DeRosso Landfill's consulting firm, the Department noted that its approval of DeRosso's plans for the borrow source did not eliminate the need for DeRosso's compliance with, *inter alia*, "local . . . zoning and regulatory requirements."

---

(p) *Arbitration award.* Within 90 days after the last day for submitting final offers under par. (f), the board may issue an arbitration award with the approval of a minimum of 5 board members. If the board fails to issue an arbitration award within this period, the governor shall issue an arbitration award within 120 days after the last day for submitting final offers under par. (f). The arbitration award shall adopt, without modification, the final offer of either the applicant or the local committee except that the arbitration award shall delete those items which are not subject to arbitration under sub. (8) or are not consistent with the legislative findings and intent under subs. (1) and (2). A copy of the arbitration award shall be served on the applicant and the local committee.

(q) *Award is binding; approval not required.* If the applicant constructs and operates the facility, the arbitration award is binding on the applicant and the participating municipalities and does not require approval by the participating municipalities.

(r) *Applicability of arbitration statutes.* Sections 788.09 to 788.15 apply to arbitration awards under this subsection.

(s) *Environmental impact.* An arbitration award under this subsection is not a major state action under s. 1.11 (2).

DeRosso argues that even though the borrow source may be exempt from regulation by the Department as a solid-waste facility, *its status* as a borrow source in connection with a solid-waste facility that is subject to Department regulation nevertheless makes the site's *restoration* also subject to Department regulation. The only support for this proposition is the agreement by a Department engineer in his deposition with a statement that the Department controls "what can be used to fill [a] borrow source," and a letter from a Department attorney that:

> The Department has consistently taken the position that a clay borrow site developed in connection with a landfill is part of the landfill project over which DNR has jurisdiction. This is true whether or not the borrow source is adjacent to, or removed from, the area of solid waste disposal.[9]

DeRosso, however, cites no applicable statute or regulation (and we have found none) that gives to the Department regulatory authority over the *filling* of borrow sources that are exempt from regulation by virtue of WIS. ADM. CODE NR § 500.08(2), as opposed to control over the sites' *excavation*. *See* WIS. ADM. CODE NR § 512.18. The only regulation DeRosso cites is WIS. ADM. CODE NR § 504.05(10)(e), which requires that "[a]ll borrow areas shall be abandoned in accordance with section 208.3 of the Wisconsin Department of Transportation standard specifications for road and

---

[9] The letter, dated July 23, 1992, was sent by a Department attorney to Oak Creek's City Attorney, and noted "that, from an environmental standpoint, the Department could approve either a proposal to allow the borrow source to remain as a pond [as wanted by Oak Creek], or a proposal to fill it to grade with the 'clean fill' specified in NR 500.08(2)(a), Wis. Adm. Code [as wanted by DeRosso]."

bridge construction." As a site exempt from "the requirements of chs. NR 500 to 522" by virtue of WIS. ADM. CODE NR § 500.08(2), however, the borrow source at issue here is not governed by WIS. ADM. CODE NR § 504.05(10)(e). Section NR § 504.05(10)(e) is thus not relevant to this appeal.[10]

Although we give due deference to an agency's long-standing interpretations of its own regulations and the statutes under which the agency operates, *Metropolitan Greyhound Management Corp. v. Wisconsin Racing Board*, 157 Wis. 2d 678, 688, 460 N.W.2d 802, 806-807 (Ct. App. 1990), that deference is not given when that interpretation is founded upon nothing but the opinions of the agency's subordinate employees, *Holton & Hunkel Greenhouse Co. v. State*, 274 Wis. 337, 345, 80 N.W.2d 371, 376 (1957). There is no indication that the statements by the Department engineer and the Department attorney, insofar as they support DeRosso's pre-emption argument, either represent the

---

[10] Moreover, § 208.3 of the WISCONSIN DEPARTMENT OF TRANSPORTATION STANDARD SPECIFICATIONS FOR ROAD AND BRIDGE CONSTRUCTION (1989 ed.), merely requires, except for "commercial pits," that "the available topsoil or other soil of a nature conducive to plant growth" removed from a borrow source be saved "in sufficient quantities to cover all surfaces of excavated areas within such [borrow source] pit to a depth of from four to six inches" or to the topsoil's "original depth," if there was less than four inches of top soil prior to excavation. Following excavation, the pit is to be "trimmed and finished," and the saved topsoil "shall be uniformly spread over all excavated areas of the borrow pit, except as otherwise authorized by the engineer in writing." *Ibid.* Section 208.3 does not require, or even purport on its face to permit, the filling of a borrow-source pit that has been excavated to provide material needed for the construction of roads and bridges.

carefully considered policy of the agency or are based upon any statute, regulation, or rule. The overriding intent of the legislature to recognize and, insofar as is possible, accommodate local environmental and health concerns, must, therefore, control.

In sum, we conclude that when an operator proposes to use a borrow source for solid-waste disposal, and that proposed use is exempt from regulation by the Department of Natural Resources under WIS. ADM. CODE NR § 500.08(2) because of the nature of the solid waste, that proposed use is subject to local regulation even though the Department had authority to regulate the borrow source's excavation. Under the circumstances here, the legislature has not expressly withdrawn the power of Oak Creek to regulate DeRosso's proposed use of the borrow source, and, therefore, the ordinance at issue passes the first part of the *Anchor Savings* test.[11]

> 2. *Does Oak Creek's ordinance "logically conflict," "defeat the purpose of," or "go against the spirit of the state legislation"?*

---

[11] Although not briefed by the parties, we note that even facilities exempted from Department regulation by WIS. ADM. CODE NR § 500.08(2) are not exempt from the "locational requirements of s. NR 504.04 . . . (4)(a) to (e)." WIS. ADM. CODE NR § 500.08(2). *See supra* note 5. WIS. ADM. CODE NR § 504.04(4)(c) provides:

> PERFORMANCE STANDARDS. No person may establish, construct, operate, maintain or permit the use of property for a solid waste land disposal facility within an area where there is a reasonable probability that the facility will cause:
>
> (c) A detrimental effect on any surface water.

The record is silent as to whether filling the pond would have "[a] detrimental effect on any surface water."

64

Although phrased separately, parts two, three, and four of the four-part *Anchor Savings* test are essentially the same, at least in their application here: whether local regulation is repugnant to the purpose underlying the state's regulation of the matter of statewide concern. *See Local Union No. 487 v. City of Eau Claire* , 141 Wis. 2d 437, 445–446, 415 N.W.2d 543, 546 (Ct. App. 1987), *aff'd,* 147 Wis. 2d 519, 433 N.W.2d 578 (1989). Here, contrary to the situation in *Anchor Savings* , where the municipality's attempted regulation of the lending practices of state chartered savings and loan institutions was on a "collision course" (120 Wis. 2d at 401, 355 N.W.2d at 240) with the legislature's "complex and comprehensive statutory structure dealing with all aspects of credit and lending" (120 Wis. 2d at 397–398, 355 N.W.2d at 238), the legislature has specifically recognized and attempted to accommodate local concerns in the siting and operation of solid-waste facilities, *see* § 144.445, STATS. Permitting local regulatory control in those situations where the facilities are exempt from state regulation—the case here—is thus consistent with, and not repugnant to, the purpose and spirit of the state legislation. Accordingly, the ordinance satisfies the remainder of the *Anchor Savings* test.

■

Based on the foregoing, we conclude that Oak Creek's authority to regulate the borrow source is not preempted by state law.[12]

---

[12] DeRosso seeks actual costs and fees under RULE 809.25 (3), STATS., contending that Oak Creek's appeal is frivolous. In support of that contention, DeRosso points out that in a prior action, *DeRosso Landfill Company, Inc. and Gordon DeRosso v. State of Wisconsin, Department of Natural Resources* (Milwaukee County Circuit Court Case Number 89-CV-009298), which

*By the Court.*—Order reversed.

concerned the closure of the landfill site, Oak Creek joined DeRosso and the Department in agreeing "that the issue of abandonment of the Borrow site located immediately East of the DeRosso landfill . . . shall be subject to the jurisdiction of the Wisconsin Department of Natural Resources," and that "the City of Oak Creek ordinances, including the landfill Ordinance and nature conservancy ordinance, are preempted by State law, as they would otherwise apply to the Borrow Site and land immediately adjacent to the East and South of the Borrow site." (Capitalization in original.) DeRosso also notes that Oak Creek's city attorney advised Oak Creek's mayor and common council in a memorandum dated October 15, 1990, that it was his "belief that a court would rule that the DNR's jurisdiction takes precedence over the City's jurisdiction on both the landfill site and the borrow site since it is all part of the same operation." DeRosso does not argue that Oak Creek is bound by the prior stipulation and the city attorney's memorandum, nor could it. *See Fletcher v. Eagle River Memorial Hospital, Inc.*, 156 Wis. 2d 165, 178–180, 456 N.W.2d 788, 794-795 (1990) (party not bound by its concession on a legal issue); RULE 904.08, STATS.; STEPHEN A. SALTZBURG ET AL., FEDERAL RULES OF EVIDENCE MANUAL § 408, at 511 (6th ed. 1994) (interpreting FRE 408, the analogue to RULE 904.08) (compromise of claim in prior action not admissible to prove liability in subsequent action). In light of our conclusion that Oak Creek's regulation of the borrow source is not preempted by state law, DeRosso's motion for frivolous-appeal costs is denied.